(No. 28921.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LOUISE MEYERS, Plaintiff in Error.

*Opinion filed November 21, 1945—Rehearing denied Jan. 17, 1946.*

MAURICE ·R. MARCHELLO, of Chicago, for plaintiff in error.

GEORGE F. BARRETT, Attorney General, and WILLIAM J. TUOHY, State's Attorney, of Chicago, (EDWARD E. WILSON, JOHN T. GALLAGHER, MELVIN S. REMBE, JOSEPH A. POPE, and RICHARD B. AUSTIN, all of Chicago, of counsel,) for the People.

Mr. JUSTICE GUNN delivered the opinion of the court:

Plaintiff in error, Louise Meyers, hereafter referred to as defendant, was indicted for the crime of murder by abortion. A jury being waived, she was tried by the judge in the criminal court of Cook county, and found guilty of manslaughter, and sentenced to the women's reformatory

at Dwight, for a term of not less than one nor more than three years. Motions for a new trial and in arrest of judgment were denied.

The errors assigned, although numerous, include no more than (1) the finding and judgment of the court are not supported by the evidence; and (2) the court received improper evidence on the part of the People and excluded proper evidence offered by the defendant.

March 9, 1944, the deceased and her husband called at the home of the defendant on Kenwood avenue, Chicago. The deceased told the defendant she was pregnant and wanted an abortion performed. To this defendant agreed, saying she had performed quite a number without trouble, and that the charge was $50, which was paid. She then took deceased into a bedroom, and within sight of the husband used a certain syringe, pump and other instruments designed to cause an abortion. He saw these instruments after they had been so used, and saw defendant clean and sterilize them. Defendant said the abortion might happen within a couple of hours, or possibly two or three days, and even after two weeks, but if nothing happened within three days to come back. The husband was on furlough and returned to the army March 13. Deceased died March 21.

The evidence also shows that on the afternoon of March 20, the deceased, after telephoning, came to the home of the defendant. About six P.M. the defendant called the father-in-law of the deceased, who came over and saw deceased lying on a bed. She was unable to talk, blood was coming from her mouth; her bed and clothes were stained from blood. She also had an abrasion on her cheek bone. She had been at the apartment of defendant for several hours, and at the insistence of the father-in-law was taken to the county hospital.

March 24, defendant gave a statement to the police. She said she had known the deceased several months; that

deceased called her by phone March 20, and was invited over. When she came in about one P.M. she looked pale, ill and depressed, and did not feel well, and after a few moments deceased said she had to go to the bathroom, as she had taken medicine to get rid of something. In a very short time defendant heard a thump, and looking into the bathroom saw deceased lying on the floor, where she was unconscious or had fainted. Deceased was dragged from the bathroom and a doctor called, who arrived about four P.M. In a second statement signed by her, the defendant admitted performing the acts on March 9, described by the husband, and that she had thrown the instruments into the garbage after deceased died. At the hospital, deceased miscarried shortly before death. A spinal tap was taken, which showed the spinal fluid clear, and this, according to medical testimony, ruled out skull fracture or cerebral accident. An autopsy was performed, which did not include examination of the skull or brain. The lungs showed focal hemorrhagic bronchopneumonia.

The doctor called as a court witness testified he noticed a bruise on the right temple of the deceased, but did not notice the other hemorrhages, and his opinion, based almost entirely upon the history as related by defendant, was deceased had a cerebral lesion of some kind, and possibly a brain hemorrhage.

A number of doctors testified as experts upon hypothetical questions propounded by both the People and the defendant. Those of the People were of the opinion the cause of death was the result of focal hemorrhagic bronchopneumonia, associated with a recent pregnant uterus. Further clarification by questioning indicates these experts were of the opinion an abortion was the direct cause of death. An expert testified on behalf of defendant that in his opinion the bruise on the head could also be associated with bronchopneumonia; that the death might have occurred by cerebral hemorrhage, and that he did not think there

was any causal connection between the action on March 9 and the bronchopneumonia. Without going into the scientific details, the testimony of some doctors attributed the immediate cause of death to an abortion, and others to a fall causing a cerebral hemorrhage, and the abortion incident to the fall. The determination of the facts is primarily for the trial court.

In this case there is no denial of the testimony of the husband of the attempt at abortion on March 9. The defendant in her second statement admits such an attempt took place. She does not deny the facts testified to by the husband, the father-in-law, or the admissions made to the police. The evidence shows, without doubt, the defendant on March 9 attempted to bring about an abortion. Can we say, as a matter of law, a fall occurring a few days later, in the apartment of the defendant, producing a bruise upon the head, or even a cerebral hemorrhage was an independent cause of death, or was it one of the results which might mediately result from an abortion, or attempt at abortion?

We might dispose of the contention of defendant upon the proposition that the entire basis of the hypothesis propounded to her experts is founded upon the fact deceased had a fall on March 20. The only evidence of this is contained in the confession of the defendant. That part thereof is self-serving, and for that reason could be rejected by the court or jury. (Ency. of Evidence, vol. 3, p. 350; *Commonwealth* v. *Hunton,* 168 Mass. 130, 46 N.E. 404; *State* v. *Novak,* 109 Iowa, 717, 79 N.W. 465; 33 Am. Dec. 263.) Assuming, however, there was such a fall, there is another reason the theory of defendant is untenable. March 9 defendant performed an operation which was designed to produce an abortion. This might happen very soon, or perhaps after two weeks. The immediate cause of death could be blood-borne sepsis from the uterus caused by such abortion. This is given as the cause

of death by witnesses for the People, and admitted as possible by defendant's witnesses, especially if fracture of the skull or cerebral hemorrhage were ruled out. Defendant's counsel assumes that if the focal hemorrhagic bronchopneumonia, of which deceased died, was caused by a fall, as narrated in the statement of defendant, an independent cause of death has been established. There is nothing in the evidence to show the alleged collapse of deceased was not the result of sickness brought on by the abortion operation; and, in fact, defendant stated deceased appeared ill, depressed and pale before she fell.

The law is that when the State has shown the existence, through the act of the accused, of a sufficient cause of death, the death is presumed to have resulted from such act, unless it appears death was caused by a supervening act disconnected from any act of the defendant. In the state of the record here disclosed, it is immaterial that the fall may have hastened the death, or, if caused by illness produced by the abortion, was the immediate cause of it. The cause of death would still be the illegal abortion.

In Hale's Pleas of the Crown, vol. 1, p. 428, it is said: "But if a man receives a wound, which is not in itself mortal, but either from want of helpful applications, or neglect thereof, it turn to a gangrene, or a fever, and that gangrene or fever be the immediate cause of his death, yet, this is murder or manslaughter in him that gave the stroke or wound, for that wound, though it were not the immediate cause of his death, yet, if it were the mediate cause thereof, and the fever or gangrene was the immediate cause of his death, yet the wound was the cause of the gangrene or fever, and so consequently is *causa causati.*"

So, in a case where a person was assaulted by the defendant and was exposed to inclemencies of the weather, the point was made the deceased might have died by congestion of the brain, or exposure to the weather. The court, in applying the law applicable to such a situation,

said: "According to the principles laid down by these ancient authorities, as applicable to this case, if Kelley, as charged, inflicted the wounds upon Herron, and they were fatal, of which he died; or if they were dangerous in themselves, though not necessarily fatal, and the wounds caused the congestion of the brain, of which Herron died; or if the congestion of the brain caused his exposure to the inclemencies of the weather, by which he died; it must be held that Kelley, by the infliction of the wounds, caused the death of Herron." *Kelley* v. *State,* 53 Ind. 311.

In *Cunningham* v. *People,* 195 Ill. 550, one of the question for the jury to determine was whether the bruises upon the head of the deceased were caused by the blow from the fist of the defendant, or by a fall upon the pavement, and whether the fall upon the pavement was because of an injury or a shock resulting from the blow, or from drunkenness, or from the effect of his many ailments. In passing upon this the court said: "If the blow so physically affected the deceased as that from the injurious effects thereof he was rendered unable to stand and walk, and as a consequence fell upon the cobble-stones and death resulted from the fall, the blow is to be regarded as the cause of death, even though it might not, within itself, have proven mortal. (2 Bishop on Crim. Law, 7th ed. sec. 637.) If death results indirectly from a blow through a chain of natural causes, unchanged by human action, the blow is regarded as the cause of death. (*Kelly* v. *State,* 53 Ind. 311.) If the injuries which caused the death of Hartman proceeded from the fall upon the pavement, and his inability to stand erect arose wholly from one or more of his many physical infirmities and afflictions or from intoxication, and such inability to maintain an upright position was not contributed to, mediately or immediately, by the blow, his death should be attributed to natural causes." This language is cited with approval in *Koser* v. *People,* 224 Ill. 201.

In the present case the evidence shows beyond a reasonable doubt that an illegal act was committed by the defendant, which might, in the natural course of events, result in death. A supervening cause claimed by the defendant to have broken a natural sequence is a fall, but, under the evidence in the case, the fall might just as properly be attributed to illness caused by defendant's illegal act as to an independent supervening cause, supposed to arise disconnected from the defendant's action.

It seems to us that where the evidence fails to show anything of an independent nature that would cause the deceased to collapse and fall, it may be regarded as a part of a natural sequence of an illegal operation. Even if this conclusion does not necessarily follow, there is still nothing but a part of the confession of the defendant to establish there had been a fall, and that discloses the deceased was weak, pale and ill before it occurred.

From all the evidence, it was within the province of the trial court to find and determine whether the attempt at abortion was the immediate cause of death, or whether the immediate cause of death was a fall produced by the attempt at abortion. In either case the proof would sustain the charge. On the other hand, as pointed out in the *Cunningham case,* if the fall arose from a cause wholly disconnected with the acts of the defendant and produced death, the defendant would not be responsible. However, the mere fact of a fall, if there was a fall, would not, of itself, establish a supervening independent cause.

With these considerations in mind we think the evidence is ample to establish the guilt of the defendant beyond a reasonable doubt, as the trial court found. The judgment of the criminal court of Cook county is affirmed.

*Judgment affirmed.*