112 So.2d 212

**Arthur FRAZIER**

v.

**STATE.**

**4 Div. 380.**

Court of Appeals of Alabama.

Oct. 7, 1958.

Rehearing Denied Oct. 28, 1958.

J. Hubert Farmer, Dothan, for appellant.

John Patterson, Atty. Gen., and Paul T. Gish, Jr., Asst. Atty. Gen., for the State.

CATES, Judge.

Frazier appeals his conviction of voluntary manslaughter for the killing of his eighteen months' old son, Uless Frazier, by beating him with a fly swatter.

The beating, lasting off and on some thirty minutes was administered about 9:30 o'clock on the night of November 14, 1957. Frazier's wife's best judgment was he hit the baby about eight or ten licks. The child died November 17.

An assistant state toxicologist testified the contusions lowered the child's resistance and it died from traumatic pneumonia. A practicing physician testified that traumatic pneumonia could come about only as a result of a lung puncture, as when a rib is fractured.

In McAllister v. State, 17 Ala. 434, the deceased, apparently on the road to recovery, suffered a relapse. The court there approved Hale's language that, though a wound be not the immediate cause of death, nevertheless if it mediately results in death within a year and a day it is murder or manslaughter as causa causati.[1] Commonwealth v. Hackett, 2 Allen, Mass., 136, People v. Meyers, 392 Ill. 355, 64 N.E.2d 531 (fall after abortion not supervening act). This principle is analogous to the rule that prevents contributory negligence from acting to absolve a defendant from criminal responsibility, Hanby v. State, 39 Ala.App. 392, 101 So.2d 553.

In a civil case as to the distribution of a joint bank account, the Supreme Court of Minnesota held that, as against demurrer, an allegation that the widow who consciously persuaded her husband (who was unaware of a serious heart ailment) to overexert himself presented a question of felonious homicide, Vesey v. Vesey, 237 Minn. 295, 54 N.W.2d 385, 32 A.L.R.2d 1090.

The qualifications of a proffered expert are largely entrusted to the discretion of the trial judge. In McMurtrey v. State, 39 Ala.App. 319, 101 So.2d 88, Mr. Sowell, an Assistant State Toxicologist (who was also the witness here) was held qualified to testify etiologically as to death from a heart attack.

Mr. Sowell testified in this case that he had taken two college courses in pathology. This was one more than at the time of his testimony against McMurtrey. He went on to say he had gone to school at Alabama Polytechnic Institute from 1944 to 1956, holding degrees of B. S. (in chemistry with a minor in pathology) and M. S. The Encyclopedia Brittanica (1952, Vol. 17, p. 376c) says pathology has come to embrace practically all medical studies save diagnosis and treatment.

Some criticism has been voiced as to the liberality which the courts, both trial and appellate, have accorded the reception of opinion evidence given by the State Toxicologist and his assistants.[2] Yet, essentially, in virtually every case, the step by step research and testing procedure used by these witnesses has been related to the jury along with the assumed data, corollaries,

1. 1 Pleas of the Crown 428.

2. See Wilson v. State, 31 Ala.App. 21, 11 So.2d 563 (testified as to determining entrance and exit bullet wounds); Kitchens v. State, 31 Ala.App. 239, 14 So. 2d 739 (as to result of an autopsy); Gettings v. State, 32 Ala.App. 644, 29 So. 2d 677 (ballistics); Rolls v. State, 35 Ala.App. 283, 46 So.2d 8 (comparison of glass fragments); Schultz v. State, 36 Ala.App. 414, 57 So.2d 128 (questioned documents); Harbin v. State, 38 Ala.App. 251, 82 So.2d 565 (blade of knife washed—n. b., *no objection by defendant*); Shiflett v. State, 38 Ala. App. 662, 93 So.2d 523 (ballistics); Richardson v. State, 39 Ala.App. 207, 98 So.2d 59 (wound sufficient to cause death); Ellis v. State, 39 Ala.App. 325, 100 So.2d 725, approved 267 Ala. 235, 100 So. 2d 732 (pressure of gun muzzle against flesh overcoming recoil); DeSilvey v. State, 245 Ala. 163, 16 So.2d 183 (skeleton that of a young person—case doubtful as precedent on corpus delicti); Hall v. State, 247 Ala. 263, 24 So.2d 20 (death caused by drowning); Phillips v. State, 248 Ala. 510, 28 So.2d 542 (wounds "sufficient" to cause death); Maund v. State, 254 Ala. 452, 48 So.2d 553 (wounds inflicted before or after death); Payne v. State, 261 Ala. 397, 74 So.2d 630 (wounds sufficient to cause death); Nichols v. State, 267 Ala. 217, 100 So.2d 750 (ballistics). In Wesley v. State, 32 Ala. App. 383, 26 So.2d 413, assistant toxicologist, while properly qualified to testify on autopsies and on photography, was held not shown to be qualified to identify wounds as having been made by a screwdriver. Bluth v. State, 38 Ala.App. 692, 92 So.2d 685 (hemorrhage—trauma etiology. No objection by defendant).

and other matters asserted to be scientifically axiomatic.

◼ Thus, while perhaps a toxicologist, for example, may not have had the extensive study or intensive training scholastically or experientially in the field of pathology which we might encounter in a specializing pathologist or a doctor of medicine, nevertheless, where the opinion called for is not of the curbstone variety but rather is predicated upon observation or laboratory demonstrations (under proper scientific controls such as those required by Tesney v. State, 77 Ala. 33), necroptic dissection, or upon reading and research, we cannot say the testimony should not go before the jury merely because the witness had not had this or that course in school. Criminal investigation can probably be called a science—and certainly it is at least a parascience—partaking as it does of the employment of scientific methods and knowledge in many fields to show by deduction or empiricism matters of cause and effect which are not within the scope of everyday observation.

◼ . An expert witness is, by definition, any person whose opportunity or means of knowledge in a specialized art or science is to some degree better than that found in the average juror or witness. McElroy, Law of Evidence in Alabama, § 127, pp. 49–50, Letson v. State, 215 Ala. 229, 110 So. 21, Hicks v. State, 247 Ala. 439, 25 So.2d 139 (nurse gave opinion as to fatality of an axe wound), cf. Daniel v. State, 31 Ala.App. 376, 17 So.2d 542.

◼ Moreover, in addition to the enquiry of the trial judge's passing on the qualifications of the proffered expert, the defendant has at least three safeguards against being railroaded by the testimony of a mountebank or charlatan: (1) he has the right of cross-examination—"thorough and sifting"—Code 1940, T. 7, § 443, and this may extend to imaginary hypotheses to test the witness' "specific gravity" (George v. State, 240 Ala. 632, 200 So. 602), or by confronting him with standard works (Smarr v. State, 260 Ala. 30, 68 So.2d 6); (2) he

may (as Frazier did here) counter with his own expert; and (3) he may request the court to instruct the jury as to the weight, *if any*, which may be given to the opinion testimony of an expert witness, Fitzhugh v. State, 35 Ala.App. 18, 43 So.2d 831, Pickett v. State, 37 Ala.App. 410, 71 So.2d 102, Duke v. State, 257 Ala. 339, 58 So.2d 764.

◼ In this instance, we are rationally bolstered in our belief that the trial judge did not abuse his discretion in allowing both the State and the defense to engage in an expert disputation as to whether contusions caused by a fly swatter could activate a process leading to death by pneumonia—since we have referred to 10 Cyclopedia of Medicine, Surgery, Specialties (F. A. Davis Co., Phila., Rev.1958), p. 860, where, in an article, The Pneumonias, by Harold L. Israel, M.D., M.P.H., we find:

"*Traumatic Pneumonia*: Phillips [J. A.M.A., 133:161 (Jan. 18) 1947] observed seventy three patients who developed pneumonia following nonpenetrating injuries to the chest. Forty five had rib fractures. In fifty four cases the pneumonia was on the injured side only; in nineteen there was 'contrecoup' injury and contralateral pneumonia. Copleman [J.M.Soc. New Jersey 51:128 (Apr.) 1954] has collected a group of pneumonias directly resulting from trauma, and has emphasized that clinical and roentgenological manifestations of a full blown pneumonia can develop within a few hours after contusion of the lung. Hemoptysis is a characteristic symptom in traumatic pneumonia; otherwise the clinical features are typical of bacterial pneumonia, and response to *antibiotics* is usually prompt. The relationship of preceding trauma to pneumonia is frequently not appreciated. In our experience, traumatic pneumonia is a not uncommon variety." [Bracketed matter added from footnotes.]

We quote from People v. Meyers, supra [392 Ill. 355, 64 N.E.2d 533]:

"The law is that when the State has shown the existence, through the act of the accused, of a sufficient cause of death, the death is presumed to have resulted from such act, unless it appears death was caused by a supervening act disconnected from any act of the defendant. In the state of the record here disclosed, it is immaterial that the fall may have hastened the death, or, if caused by illness produced by the abortion, was the immediate cause of it. The cause of death would still be the illegal abortion.

\*     \*     \*     \*     \*     \*

"So, in a case where a person was assaulted by the defendant and was exposed to inclemencies of the weather, the point was made the deceased might have died by congestion of the brain, or exposure to the weather. The court, in applying the law applicable to such a situation, said: 'According to the principles laid down by these ancient authorities, as applicable to this case, if Kelley, as charged, inflicted the wounds upon Herron, and they were fatal, of which he died; or if they were dangerous in themselves, though not necessarily fatal, and the wounds caused the congestion of the brain, of which Herron died; or if the congestion of the brain caused his exposure to the inclemencies of the weather, by which he died; it must be held that Kelley, by the infliction of the wounds, caused the death of Herron.' Kelley v. State, 53 Ind. 311.

\*     \*     \*     \*     \*     \*

"In the present case the evidence shows beyond a reasonable doubt that an illegal act was committed by the defendant, which might, in the natural course of events, result in death. A supervening cause claimed by the defendant to have broken a natural sequence is a fall, but, under the evidence in the case, the fall might just as properly be attributed to illness caused by defendant's illegal act as to an independent supervening cause, supposed to arise disconnected from the defendant's action.

"It seems to us that where the evidence fails to show anything of an independent nature that would cause the deceased to collapse and fall, it may be regarded as a part of a natural sequence of an illegal operation. \*   \*   \*

"From all the evidence, it was within the province of the trial court to find and determine whether the attempt at abortion was the immediate ·cause of death, or whether the immediate cause of death was a fall produced by the attempt at abortion. In either case the proof would sustain the charge. On the other hand, \*   \*   \* if the fall arose from a cause wholly disconnected with the acts of the defendant and produced death, the defendant would not be responsible. However, the mere fact of a fall, if there was a fall, would not, of itself, establish a supervening independent cause."

In his general charge the trial judge said:

" \*   \*   \* Now, there has been some evidence offered here in this case, that the deceased child did not have any doctor attending it. Under the laws of our State, a defendant cannot escape the penalties for an intentional act which in point of fact produces death, because death might possibly have been averted by some possible mode of treatment. The well-settled rule is where the wound in itself is dangerous to life, mere erroneous treatment of it or the wounded person suffering from it, will afford the defendant no protection in a charge of homicide. In other words, where death is caused by a dangerous wound, the person inflicting it is responsible for the consequences though the deceased might have recovered with the exercise of more prudence and with better nursing. It is not necessary, to convict him, that the wound should

have been necessarily fatal. A defendant cannot escape the penalties for an act, which in point of fact, produces death because death might possibly have been averted by some possible mode of treatment."

This was excepted to:

"The defendant excepts to the portion of the Judge's charge which in effect calls the attention of the jury that the defendant had made some contention or discussion that the death of the deceased might have been brought about or caused by improper treatment."

Frazier's wife, a prosecution witness, having waived her privilege, testified on cross:

"Q. Did you call a doctor or see a doctor about the baby? A. No, sir.

"Q. You didn't take him to a doctor? A. No sir.

"Q. You didn't call a doctor? A. No, sir.

"Q. Now, at times before that, when the children got sick, you carried them to a doctor, didn't you? A. Yes, sir, when they had to go.

"Q. You got medicine and you carried them to Doctor Lies, didn't you? A. Yes, sir. I had never carried him to Dr. Lies.

"Q. Did you ever carry him to any other doctor? A. No, sir. Just when he was first born.

"Q. You didn't see any doctor or make any complaint to a doctor about the child Friday or Saturday, did you? A. No, sir."

On redirect the solicitor brought out:

"Q. Elvy, after Arthur Frazier whipped Uless Frazier, did he take him to the Doctor? A. No, sir."

Then on recross she testified further:

"Q. Arthur worked the two days and you didn't say anything to the doctor or call a doctor or anything else? A. No, sir."

Emanuel Ward, a defense witness, the stepfather of Elvy Frazier, testified that he spent the night of November 16–17 at the Frazier home, that the baby slept in the bed with him, and he found it dead on getting up in the morning.

On cross, without objection, he was questioned as to a statement he gave the police:

"Q. Did you tell him there in that statement that you went to the home of your step-daughter and Arthur Frazier on Saturday night? A. Yes, sir.

"Q. Did you tell him there that Uless Frazier, the baby was sick when you got there? A. Yes, sir.

"Q. Did you tell him that on Saturday afternoon: 'I noticed that Uless had a black bruise on his hip'? A. I sure did.

"Q. You told him that? A. I sure did.

"Q. Did you tell him also that, 'Elvy put the baby to bed with me Saturday night and the baby did not move any more until I picked him up Sunday morning'? A. Until Mr. Brown picked him up Sunday morning."

We think the foregoing from testimony shows the "deceased child did not have any doctor attending it" as the trial judge said. We fail to infer any intimation that this neglect (which might equally fall on the mother) would aggravate any offense of the father.

The court further said:

" * * * The State has offered a witness whose qualifications were

proven to show that he could qualify to testify as an expert and the defense has offered a witness and has proven his qualifications which allow him to testify as an expert.  \* \* \*"

and the defendant excepted as follows:

"\* \* \* To that portion of the Judge's charge which instructs the jury, in effect and substance, that the witness Sowell's qualifications as an expert witness to testify as to the issues, the injuries and the cause of death in this case had been proved."

Also from the oral charge:

"\* \* \* Expert testimony, gentlemen, can be given, in two ways or manners. One is by mere opinion evidence, that is, based on some facts that are related to the expert witness; where the expert has no knowledge, no personal knowledge of any of the facts in the case, and bases his evidence merely as an opinion upon some question propounded to him, of a given state of facts. As I recall, that was the nature of the evidence given by Dr. Turner in this case, mere opinion evidence, because he \* \* \* I believe his evidence was to the effect that he had not attended the deceased and made no examination and all he could give in this case as an expert witness, was opinion evidence.

"Now, Mr. Sowell was introduced by the State as an expert, and his testimony covered a little more ground. He not only gave opinion evidence as an expert but he gave also some evidence relating to actual facts, based upon an examination that he had made. So, as I say, the evidence of the expert witness in this case are based upon facts as he found them and on the opinion that he formed by reason of his

peculiar training or education or experience which is not common knowledge to the common run of people, like you and I."

which brought this exception:

"\* \* \* to that portion of the Court's charge which in effect and substance instructs the jury that the witness Sowell, on account of having made the autopsy in question, was possibly in a better position to give expert opinion testimony as to the nature and extent of the injuries as they might effect the cause of death than by reference to Dr. Turner who was not present at such autopsy, it being shown that Dr. Turner based his opinion on the same facts upon which the witness Sowell based his opinion, that is, substantially the same facts."

Our general discussion and dicta as to expert witnesses and opinion evidence hereinabove serve to point out there was no error in the two latter portions of the oral instructions. We do not read the last as fairly saying Mr. Sowell's testimony was better because it came partly from observation as contrasted with that of Dr. Turner (who had no opportunity to examine the body), which was necessarily confined to answers to hypothetical questions.

■ The defendant says he should have had the affirmative charge given in his behalf as to voluntary manslaughter. His argument depends on the excision of the toxicologist's testimony; what we have said before covers our reasons for not finding error in the refusal below to give such a direction.

We have examined the entire record and find it free of any prejudicial error.

Affirmed.