THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
WILLIAM GULLIFORD, Defendant-Appellant.

Third District No. 78-229

Opinion filed July 10, 1980.—Rehearing denied August 11, 1980.

238

Robert Agostinelli and Peter Carusona, both of State Appellate Defender's Office, of Ottawa, for appellant.

Michael M. Mihm, State's Attorney, of Peoria (John X. Breslin and Gerry F. Gnidovec, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE BARRY delivered the opinion of the court:

Defendant, William Gulliford, was convicted, following a jury trial in Rock Island County on a change of venue, of felony murder and armed robbery. He was sentenced to a term of imprisonment of 35 to 70 years for felony murder and 10 to 20 years for armed robbery with both sentences to run concurrently.

Defendant was initially charged by indictment with two counts of murder and one count of armed robbery. After guilty verdicts were returned on all counts of the indictment the trial court entered judgment conviction only on the counts charging defendant with felony murder and armed robbery.

The State's evidence tended to establish that on July 23, 1977, Dr. Dominic Volturno was struck on the head with a metal pipe by Michael Robinson and robbed. More particularly, the evidence showed that Dr. and Mrs. Volturno drove into the alley behind their home at approximately 10 p.m. on July 23, 1977. At that point, Mrs. Volturno observed a car behind them in the alley. While Dr. Volturno prepared to put the car in the garage, Mrs. Volturno went to the back door of their home. Her daughter, Faith Volturno, let her in. Shortly after entering through the back door to her home, Mrs. Volturno heard a noise that sounded like a "thud." She went outside on the back porch and observed a man with an object in his hands leaning over her husband who was lying at the bottom of the steps. The suspect went through Dr. Volturno's pockets.

Faith Volturno also heard a noise, shortly after her mother returned home. She indicated that the object in the suspect's hands was a pipe.

Several hours later the defendant, one Michael Robinson and a James Hines were stopped and arrested. At the time of the stop, Robinson and Hines were in the front seat of Robinson's car. The defendant was in the back seat.

A chrome-plated pipe with blood on it was found on the passenger side of the front seat. The blood on the pipe was later typed as Group B. Dr. Volturno was also typed as Group B. Expert evidence opined that Robinson's fingerprints were on the pipe.

Other evidence established that the defendant, after receiving his *Miranda* rights, signed a written statement, several hours after his arrest. This statement was admitted into evidence. According to this statement, on the night in question, the defendant, Hines and Robinson were riding in Robinson's car "looking for someone to rob." Hines, who was driving Robinson's car, pulled into an alley and observed a vehicle. Then Hines backed out of the alley and, on Robinson's order, parked on the street. All three exited the vehicle and went through another alley in order to surprise a victim. Robinson was carrying a silver pipe. Hines and the defendant had no weapon. The defendant stood approximately 20 to 30 feet away from Hines and Robinson. He heard a couple of "whacks" and then some footsteps. All three men ran to the car and left.

By stipulation, it was established that personal identification cards and credit cards belonging to Dr. Volturno were found on July 24, 1977, at various street intersections on the south side of Peoria.

Medical testimony indicated that Dr. Volturno was rendered unconscious by a blow to the head. He was found lying face down on the sidewalk near the back stairs. There was blood in his nose and mouth, preventing him from breathing.

Dr. Volturno was taken to St. Francis Hospital in the early morning hours of July 24, 1977. He was first examined by Dr. McLean and found to be comatose. The victim suffered a skull fracture and a hematoma developed on the left side of his brain with swelling. A neurosurgeon was consulted and surgery was suggested. A craniotomy was performed, and the blood clot was removed. The surgeon testified that during the surgery he observed that the temporal parietal lobe regions of the brain were bruised. He further testified that the result of this injury would be that Volturno would lose his language function and would not be able to interpret what he saw or heard and probably would not be able to utter verbal sounds. The victim remained comatose and though his condition was critical, the surgery was termed a technical success. However, several days later Volturno developed congestion in his lungs. Tests subsequent to surgery indicated that the swelling of the brain was worse, and that the brain was functioning even less than before surgery. On the morning of his death the victim's lungs were again found to be congested. He died on July 30, 1977.

The hospital pathologist, Dr. Kalyanaraman, indicated that the immediate cause of death was an extensive type of pneumonia which had existed in the lungs anywhere from 2 to 4 days. The pathologist testified that the pneumonia was probably caused by the victim's comatose state. The treating physician and neurosurgeon, Dr. Henderson, testified that no pulmonary expert had been called in and that he had never entertained with certainty that his patient had pneumonia because "from a practical standpoint it had no significance." In his opinion the patient was a "lost cause".

Defendant has raised four issues on appeal: (1) whether the State failed to prove beyond a reasonable doubt that the legal cause of death was not the intervening acts of the treating physician; (2) whether the defendant was denied his right to a fair trial because the jury instruction on murder failed to fully and fairly inform the jury of the law applicable to the defense theory that the legal cause of death was an intervening cause; (3) whether for purposes of double jeopardy, felony murder and the underlying felony are the same offense and defendant's judgment of conviction and sentence for armed robbery should be vacated; and (4) whether the sentence imposed upon the defendant is excessive because it ignores important mitigating factors surrounding the offense.

The first argument of the defendant is that the State failed to prove beyond a reasonable doubt that the legal cause of Volturno's death was not the intervening acts of the treating physician, *i.e.*, a lack of treatment for the resulting pneumonia, a complication of the injury. One element of the offense of murder which the State must prove beyond a reasonable doubt is that of causation. The defendant does not contest the applicability of the legal theory of his accountability for the actions of Michael Robinson who actually struck the victim on the head and subsequently robbed him. His theory is that the treating physician was the independent intervening cause of the death of Volturno. Defendant bases his theory of an intervening legal cause of death upon certain facts brought out in the testimony of the State's witnesses. The State's evidence, as defendant concedes in his brief, tended to show that Robinson caused Dr. Volturno's comatose state with considerable brain damage for which the defendant is accountable. Dr. Kalyanaraman, a pathologist, testified that the *immediate* cause of death was pneumonia, but she concluded that the proximate cause of death was the patient's comatose state. According to the treating physician, Dr. Henderson, the brain damage which Volturno suffered from the blow to his head caused the comatose state and that same brain damage caused Volturno to not breathe properly. Dr. Henderson testified that the brain damage from the blow to Volturno's head caused him to lack the neurological function to breathe properly. This in turn made Volturno's body unable to rid his lungs of secretions.

When secretions collected in the lungs, the patient had trouble with exchanges of oxygen and carbon dioxide which resulted in pneumonia developing. Dr. Henderson testified that "he died because he wasn't breathing right because his brain wasn't working right."

■■ The law of proximate causation in criminal cases has been aptly summarized in *People v. Meyers* (1945), 392 Ill. 355, 64 N.E.2d 531. "The law is that when the State has shown the existence, through the act of the accused, of a sufficient cause of death, the death is presumed to have resulted from such act, unless it appears death was caused by a supervening act disconnected from any act of the defendant." (392 Ill. 355, 359, 64 N.E.2d 531, 533.) It has been generally recognized that where a person inflicts upon another a dangerous wound which is calculated to endanger or destroy life, that person cannot exonerate himself from the consequences of his act by showing that his alleged victim's death resulted from unskillful or improper medical treatment. (*People v. Stamps* (1972), 8 Ill. App. 3d 896, 291 N.E.2d 274; Accord, Annot., 100 A.L.R.2d 769, 783 (1965).) We have read the record and have determined that it shows no evidence of unskillful medical treatment. Defendant's argument is that Dr. Henderson withheld medical treatment for pneumonia, which act may have been sufficient to break the chain of causation between Robinson's striking Volturno and his resulting death. We must decide whether Dr. Henderson's alleged nontreatment for pneumonia constitutes an independent supervening cause of Volturno's death. The problem of legal causation arises in both tort and criminal law cases, and they are analogous to each other and have been treated in a similar manner by the courts. Consequently in both the criminal law and in tort law the concept of foreseeability of the ensuing harm caused from the culpable act of a defendant plays a large role. It is generally held that a defendant who inflicts a dangerous wound upon his victim, such as in the present case, is responsible for the victim's death despite unskillful or even improper medical treatment which aggravates the wound or contributes to cause the death because the unskillful medical treatment is reasonably foreseeable. However, where the medical treatment is so bad as to constitute gross negligence or intentional malpractice, such gross or intentional medical maltreatment constitutes a valid defense because the intervening conduct is abnormal and not reasonably foreseeable.

■■ In the case at bar, the record, in our opinion, contains no evidence to establish gross negligence or intentional maltreatment on the part of the treating physicians; the alleged act or omission of the victim's physicians was not disconnected from the culpable act of striking the victim. As aforesaid, a supervening act will not relieve an accused from responsibility for death of another unless that act is disconnected from the act of the accused. (*People v. Paulson* (1967), 80 Ill. App. 2d 44, 225 N.E.2d

424.) The record supports the conclusion that the direct and proximate result of the head injuries of the victim was the onset of pneumonia from which he ultimately died. The death of Volturno was a natural and foreseeable consequence of the blow to the victim's head and the resulting dangerous wound. The legal chain of causation from the blow to the head and the ultimate death was unbroken under the facts presented to us, and "[t]he attending physicians and the family of the victim owe no duty to the defendant to treat the victim so as to mitigate the defendant's criminal liability. The defendant's desire to mitigate his liability may never legally override, in whole, or in part, the decisions of the physicians and the family regarding the treatment of the victim." *In re. J. N.* (D.C. Cir. 1979), 406 A.2d 1275, 1282.

The State established a sufficient legal proximate cause of death through an act for which the defendant Gulliford was responsible and a presumption arose that the death resulted from the culpable act of striking Volturno. This presumption was not rebutted by the defendant by any contrary evidence that the sole cause of the victim's death was the intervening gross negligence of physicians. Under similar facts the identical argument, that there was insufficient proof beyond a reasonable doubt as to cause of death, was unqualifiedly rejected. (*People v. Reader* (1962), 26 Ill. 2d 210, 186 N.E.2d 298 (shooting with resulting pneumonia); *People v. Baer* (1976), 35 Ill. App. 3d 391, 342 N.E.2d 177 (blow to head with resulting pneumonia); and *People v. Paulson* (1967), 80 Ill. App. 2d 44, 225 N.E.2d 424 (blow to head with an infection developing following surgery).) The pneumonia was a part of a natural sequence of events which originated in Robinson's illegal conduct. We believe that the State established beyond a reasonable doubt that the legal cause of death in this case was the result of conduct for which defendant Gulliford was legally accountable. Defendant's reliance upon *People v. Calvaresi* (1975), 188 Colo. 277, 534 P.2d 316, to support his theory of a supervening cause of death is misplaced. The facts in *Calvaresi* are clearly distinguishable from the case now before us.

■■ In a related argument the defendant also contends that he was denied a fair trial because the murder instructions failed to fully inform the jury of the law applicable to the defense theory that the legal cause of death was an intervening cause. The causation instruction which was actually given simply stated that the jury would have to find the acts of Robinson caused Volturno's death. It is the duty of the trial court to instruct the jury as to the law, and particularly as to defendant's theory of the case if there is any evidence supporting it. (*People v. Kent* (1976), 40 Ill. App. 3d 256, 350 N.E.2d 890.) Defendant failed to tender an applicable causation instruction and to request the trial court to give it. The trial court is not

obligated to instruct on its own motion. (*People v. Parks* (1976), 65 Ill. 2d 132, 357 N.E.2d 487.) "[N]o party may raise on appeal the failure to give an instruction unless he shall have tendered it." (*People v. Underwood* (1978), 72 Ill. 2d 124, 129, 378 N.E.2d 513, 515.) We hold that the defendant waived any error in the trial court's failure to instruct the jury on the effect of any intervening cause or proximate causation by failing to give the desired instruction. Defendant claims that the waiver rule should not be applied because of the substantial defect exception in jury instruction issues set out in Supreme Court Rule 451(c). (Ill. Rev. Stat. 1977, ch. 110A, par. 451(c).) In light of our decision on the adequacy of proof beyond a reasonable doubt by the State as to the legal cause of Volturno's death, we believe no substantial defect was present nor do we find that the interest of justice requires a relaxation of the waiver rule in the present case.

■■ ■ The third issue presented is whether felony murder and the underlying felony of armed robbery are the same offense for purposes of the constitutional prohibition of double jeopardy. Defendant contends that both offenses are the same and urges that his conviction and sentence for armed robbery should be vacated. The test to be applied to determine whether there are two offenses or only one for double jeopardy purposes is whether one statute requires proof of a fact which the other does not. (*Brown v. Ohio* (1977), 432 U.S. 161, 53 L. Ed. 2d 187, 97 S. Ct. 2221.) Such a test presumes that the same act constitutes a violation of two distinct statutory provisions. An act, as used in this context, has been defined as an overt or outward manifestation which would support a different offense. (*People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838.) In the case before us it is clear that two different and distinct acts resulted in defendant's convictions. Upon finding their victim, one of defendant's companions, for whom he was held legally accountable, severely beat the victim with a metal pipe which caused the death of the victim. After the victim was apparently rendered unconscious the perpetrators then robbed him. Consistent with *King* we believe the defendant's convictions and sentences are permissible where here, as in *King*, the defendant has committed several acts, despite the interrelationship of those acts. Under almost identical facts defendants have been convicted of both felony murder and the underlying felony of armed robbery. (*People v. Morgan* (1976), 39 Ill. App. 3d 588, 350 N.E.2d 27; *cf. People v. McDonald* (1973), 15 Ill. App. 3d 620, 305 N.E.2d 69.) As was aptly stated in *King*, "[p]rejudice results to the defendant only in those instances where more than one offense is carved from the same physical act." (66 Ill. 2d 551, 566, 363 N.E.2d 838, 844. Accord, *People v. Schultz* (1979), 73 Ill. App. 3d 379, 392 N.E.2d 322.) We reject defendant's double jeopardy argument

because two separate distinct acts of the defendant were present, and the offense of felony murder required proof of a different fact, *i.e.*, the resulting death.

■■ Defendant also argues that armed robbery is a lesser included offense of felony murder. In the case of felony murder, proof that the underlying felony occurred is not used to establish that felony per se but is used to establish the requisite substitute criminal intent for felony murder. A similar argument that attempt armed robbery was a lesser included offense of felony murder was rejected in *People v. Green* (1975), 62 Ill. 2d 146, 304 N.E.2d 9. Although *Green* was decided by using the independent motivation test, which was expressly rejected in *King*, we believe the result in *Green* to be unaffected with regard to the theory that the underlying felony is not a lesser included offense of felony murder. By analogy, even when the underlying felony and aggravated kidnapping arise from a series of incidental or closely related acts, the one is not a lesser included offense of the other. (*People v. Schultz* (1979), 73 Ill. App. 3d 379, 392 N.E.2d 322 (deviate sexual assault and aggravated kidnapping); *People v. Carroll* (1977), 49 Ill. App. 3d 387, 364 N.E.2d 408 (rape and aggravated kidnapping).) We believe a similar result should be reached in the case at bar and conclude that the armed robbery was not a lesser included offense of felony murder.

■■ Defendant's final argument is that the sentences imposed upon him are excessive. We agree that concurrent sentences of 35 to 70 years for murder and 10 to 20 years for armed robbery are severe. However, we do not find them to be excessive in this case for several reasons. The circumstances of the crime and its brutality are hardly mitigating factors. The defendant was 19 years old at the time of sentencing. Despite his young age the defendant had a prior adult criminal record of two felony convictions, burglary and attempt burglary. He was on probation at the time he committed the offenses in this case. The record further indicates defendant's involvement in criminal activity from age 13 or 14. Sentencing is properly the function of the trial court, and a reviewing court should not substitute its judgment for that of the trial court. (*People v. Lykins* (1979), 77 Ill. 2d 35, 394 N.E.2d 1182.) Only where an abuse of discretion can be shown will reviewing courts alter the sentence imposed by the trial court. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The thrust of defendant's argument on the excessiveness of his sentences is that his guilt was proved on a theory of accountability and therefore he is somehow less culpable than his companions. A similar argument was rejected in *People v. Smith* (1977), 53 Ill. App. 3d 395, 368 N.E.2d 561. The record reflects that the trial court considered Gulliford's lesser degree of participation in the offenses but nevertheless, based upon the nature and circumstances of these particular crimes and defendant's

past history, decided that his chance of an early rehabilitation was not good. Accordingly, we find no abuse of the trial court's discretion in the sentences and conclude that the sentences imposed are not excessive.

For the reasons stated the judgment of the Circuit Court of Peoria County is affirmed.

Judgment affirmed.

STOUDER, P. J., and STENGEL, J., concur.