THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RALEIGH ROBINSON, Defendant-Appellant.

First District (3rd Division)   No. 1—88—1123

Opinion filed May 23, 1990.

Randolph N. Stone, Public Defender, of Chicago (Mary C. Arundel and James H. Reddy, Assistant Public Defenders, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Gael O'Brien, and Latisha Martin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Raleigh Robinson, was charged by indictment with reckless homicide and driving while under the influence of alcohol. (Ill. Rev. Stat. 1985, ch. 38, par. 9—3(a); ch. 95½, par. 11—501.) After a bench trial, defendant was found guilty as charged and sentenced to 18 months' periodic imprisonment. Defendant was fined $1,000 and he was assessed $20 for the Violent Crime Victims Assistance Fund (Ill. Rev. Stat. 1987, ch. 70, par. 510(c)(2)). Defendant now appeals, contending that there was insufficient evidence to prove him guilty of reckless homicide beyond a reasonable doubt.

About 9:15 p.m. on July 21, 1986, Lennise Kersh was struck by an automobile as he stepped off the curb near 800 South Pulaski Road in Chicago. Brenda Jones was an eyewitness to the accident. She tes-

tified that she had been outside her 800 South Pulaski Road apartment on the evening of July 21, 1986, talking with her friend Sheila. At that time she noticed a man walking east on Polk Street toward the Pulaski Road intersection. As this man, who was at the southwest corner of the intersection, stepped off the curb to cross Pulaski Road, he was struck by a large gray vehicle traveling south on Pulaski Road. The front passenger-side portion of the vehicle struck the man, hurling him into the air until he fell back onto the hood of the car, rolled off and was struck again. The victim ultimately landed about 100 feet away, although his shoes were found at the point of impact.

Jones testified that it appeared as though the vehicle had been traveling at a high rate of speed when it struck the victim and that the car never stopped or slowed down after the incident. Rather, it appeared to go faster after striking the victim. As the gray vehicle continued south on Pulaski, another vehicle, which had also been heading south on Pulaski, stopped at the scene. This vehicle was being driven by Terrence Rice, an individual known to Jones. Jones and the others who had gathered at the scene yelled at Rice to follow the gray vehicle that just struck the victim. Rice then departed after the vehicle.

Terrence Rice testified that at about 9:15 p.m. on July 21, 1986, he was driving his automobile west on Congress when he noticed a gray Cadillac in the left-hand lane in front of him. At the Pulaski intersection, the gray Cadillac went through the red light and turned left to go south on Pulaski Road. Rice approached the intersection, waited for the light to turn green, and then he too turned left onto Pulaski Road. Rice could see the gray Cadillac, which was traveling in the right lane or curb lane, going south on Pulaski proceeding at a high rate of speed. Rice estimated the Cadillac's speed at between 60 to 70 miles per hour.

Rice testified that he watched as the Cadillac approached the intersection at Polk Street. Rice could see that a man was standing at the curb and about to step into the street. However, Rice saw no brake lights on the Cadillac. The Cadillac did not stop or slow down, nor did it swerve to avoid the pedestrian. The Cadillac continued down Pulaski and struck the man as he stepped off of the curb. The pedestrian flew into the air, fell down onto the hood of the Cadillac, rolled off of the hood and was struck again by the Cadillac. The Cadillac never stopped after striking the man, but continued on its way south on Pulaski. Rice paused momentarily at the scene of the accident, but when he was directed by the people who had gathered to chase the Cadillac, Rice proceeded at a high rate of speed south on

Pulaski in an attempt to catch up with the Cadillac.

At the Roosevelt Road intersection, the Cadillac pulled over into the left-hand lane of southbound Pulaski and stopped at the light. Rice pulled up next to him and tried to signal to the driver to stop because he had hit a pedestrian. The driver, whom Rice later identified as defendant, ignored Rice and proceeded to turn left onto Roosevelt Road. Defendant then turned left again onto 13th Street and then left once more into an alleyway. Defendant then parked his Cadillac in a backyard of this alleyway behind a two-story structure at 1247 South Pulaski Road.

Rice followed defendant to the alleyway and saw that he had parked his vehicle. As Rice paused at the entrance of the alleyway, he noticed his fiancee's father pull up in a car next to him and Rice directed him to get the police. Then Rice drove into the alleyway and parked near the Cadillac.

As Rice stood in the backyard near the Cadillac, defendant appeared on the second-floor porch of the building at 1247 South Pulaski. Although defendant was not now wearing a shirt, Rice recognized him as the driver of the Cadillac. Defendant yelled at Rice and two other individuals who had come on the scene, asking what they were doing by his car. Defendant then began to descend the staircase on the exterior of the building. Rice noticed that defendant was walking in an unsteady manner, that defendant appeared to sway as he walked and that defendant had to hold onto his car as he stood in the backyard. Rice also noticed a strong odor of alcohol coming from defendant. Based on his previous experience as a bartender, Rice believed that defendant was intoxicated.

As defendant had been descending the stairs, two police officers arrived in a squad car. Rice pointed defendant out to the officers as the driver of the gray Cadillac that struck the man on Pulaski Road. Defendant was then arrested.

Chicago police officer Edward Kulbida testified that he and his partner, Denise Liska, received a radio transmission at about 9:20 p.m. on July 21, 1986, concerning a pedestrian being struck by an automobile at the intersection of Polk and Pulaski. They proceeded to that location and found a man lying in the street. They secured medical attention for the man and, after the paramedics arrived, began to interview the bystanders. As they were gathering information from these people a car pulled up at the scene. At the direction of the driver of this vehicle, they proceeded to the rear of the building at 1247 South Pulaski. There they saw a 1976 gray Cadillac with license number MTX 875. An individual identified as Terrence Rice was also

present. Rice directed the officer's attention to defendant, who was descending the rear staircase of the building. Rice also indicated that defendant had been the driver of the vehicle that struck the pedestrian on Pulaski Road.

Officer Kulbida testified that defendant was yelling as he descended the stairs, asking what they were doing by his car, and shouting vulgarities. Defendant appeared to have difficulty maintaining his balance. He staggered and swayed and grabbed onto things for support. Kulbida also noticed the strong smell of alcohol.

Kulbida told defendant that he was under arrest and then advised him of his *Miranda* rights and his implied-consent rights. Kulbida then asked defendant if he would agree to a breathalyzer test, a blood test or urine test to determine the alcohol content in his system. Defendant became visibly upset and began swinging his arms. He yelled that they should "just put him in the electric chair or shoot him." When the police vehicle arrived to transport him to the police station, defendant thwarted all efforts to place him inside by kicking and swinging at the officers.

After defendant was removed from the scene, Officer Kulbida inspected the gray Cadillac and noticed that the front of the vehicle had a dent and that certain plastic pieces had been broken. The hood of the car was hot to the touch and the engine made "pinging and clicking" noises, indicating that it had recently been driven. Kulbida took the vehicle identification number from the vehicle. Kulbida then identified exhibit 1 as a photograph depicting defendant's gray Cadillac.

Kulbida further testified that he spoke with defendant later that night at the police station. He again advised defendant of his rights and asked defendant to submit to testing. Defendant refused all tests, including performance tests such as touching one's nose or walking a straight line. Kulbida noticed that defendant's speech was slurred and that he was difficult to understand. Defendant continued to mutter, incoherently at times, and to swing his arms and yell that they should just shoot him. Defendant was then taken to the lockup, and as he walked he swayed and grabbed onto the bars of the cells for support.

Kulbida knew defendant, who was a cook at a restaurant that the officer frequented. Kulbida had spoken to defendant and heard him speak several times previously. Based on his general experiences as a police officer and his prior knowledge of defendant, Kulbida opined that defendant was "strongly" intoxicated.

The next two witnesses presented evidence concerning the victim, Lennise Kersh, and his cause of death. First, Dr. Tae An testified that he was the Cook County medical examiner who performed the au-

topsy on Kersh. Dr. An indicated that his external examination of Kersh revealed that, as a result of being struck by an automobile on July 21, 1986, the victim suffered fractures to the left hip, left femur, and tibia and fibula of the left leg. He also sustained a fractured humerus of the right arm, as well as multiple lacerations and abrasions. An internal examination revealed that the victim had extensive bronchial pneumonia, severe tracheitis (inflammation of the trachea), cerebral hemorrhage and contusions of both frontal lobes of the brain. The brain was in a state of necrosis due to cerebral hypoxia (lowered oxygen to the brain).

Although Dr. An's opinion was that the victim's death, which occurred on August 5, 1986, was a result of the multiple injuries sustained from being struck by an automobile, his report included the notation that one possible contributing factor was the cerebral hypoxic incident, which occurred on July 25, 1986, as a result of a cardiac arrest which might have been brought on by a malfunctioning ambu bag (a manual device used for ventilating the victim).

Dr. An explained that during his investigation of the death of the victim, he learned that the victim suffered a cardiac arrest on July 25, 1986, as he was being transported to the X-ray department. During this time, the victim was being ventilated manually with an ambu bag. According to information received from a resident doctor who had been assisting the victim, there was a possibility that the ambu bag had malfunctioned and that the reduced flow of oxygen had caused the slowing of the heart rate. Dr. An continually stated, however, that there was no clear evidence that the ambu bag had failed or that the victim's cardiac arrest was in any way related to his ventilation from the ambu bag. Dr. An indicated that the multiple injuries sustained by the victim could have caused him to suffer cardiac arrest at any time. There was no way of confirming upon examination after the victim's death the cause for the cardiac arrest.

Dr. John Barrett then testified that he was the director of the Cook County Hospital Trauma Unit. He was the attending physician for the victim and, as such, supervised and reviewed all of the physicians and medical staff who provided care and treatment to the victim on an ongoing basis.

Dr. Barrett indicated that the victim had been in shock upon his arrival at the hospital and had been placed in an anti-shock garment by the paramedic team. Examination at the Trauma Unit showed that the victim had a concussion, a shattered left hip with fragmentation, a broken and fragmented left femur, as well as open fractures (i.e., the bone was protruding from the body) of the lower left leg. The victim

required intravenous fluids and was sent to surgery immediately for treatment of the multiple fractures.

Dr. Barrett explained that the hospital used a grading system to classify the severity of injuries to a patient. The scale ranges from one to five. A grade of one is the least serious, indicating minor injuries that do not require admission into the hospital. A grade of two is still relatively minor but the patient may require admission. A grade of three indicates that the injuries may be life threatening but that the patient is expected to survive. A grade of four indicates that the injuries are definitely life threatening but that there is a chance of survival. A grade of five indicates that the patient will almost inevitably succumb due to the injuries, which are severe. Upon his arrival, the victim was classified as a grade four. Although he was able to be stabilized after surgery, the victim remained critical. He was placed in the intensive care unit, where he required the assistance of a ventilator to supply sufficient oxygen to his system.

Dr. Barrett went on to explain that the victim, like any other patient who is placed on a ventilator, was removed from the ventilator once every hour and ventilated manually with an ambu bag. This is because the ambu bag can force more air deeper into the lungs and because the patient is treated with a saline solution that is forced into the lungs to help eliminate mucus. The ambu bag is used to force this solution into the lungs and then remove it. To limit the risk of disease transmission, the victim was provided with an ambu bag upon admission and this ambu bag remained with him throughout his stay in the hospital.

The victim remained stable but critical through July 25, 1986. On that date he was transported to radiology so that more X rays could be taken to confirm a suspicion that the victim suffered a fractured neck. When taken to radiology, the victim was accompanied by a resident, a nurse and a respiratory therapist. The therapist ventilated the victim with the ambu bag that had been used by the victim since his admission. As they transported him, the monitor, attached to the victim, showed that his heart rate was dropping dramatically. Although the heart never stopped completely, it slowed to such a rate that the victim received no blood flow. This is called a functional cardiac arrest. As a result of this severely decreased rate, the victim suffered a cerebral hypoxic episode (decreased oxygen to the brain). Although the victim's heart rate was later increased and the victim was again stabilized, he never again regained consciousness. He suffered another complete cardiac arrest on August 5, 1986, from which he could not be resuscitated. Consequently, the victim died on that date.

Dr. Barrett admitted that the resident who attended the victim as he was being transported to radiology on July 25, 1986, indicated that he felt an increased resistance in the ambu bag as he tried to ventilate the victim. For this reason, the therapist examined the ambu bag and found that it contained two valves superimposed on one another, instead of one. Dr. Barrett later inspected the ambu bag and found that, despite the two valves, there was no significantly increased resistance so as to cause a reduced air flow. Thus, it was his opinion that the cardiac arrest suffered by the victim on July 25 was due to causes other than the ambu bag.

After the State completed the presentation of its evidence, defendant moved for a directed finding. The court denied the motion. Defendant then testified that about 3 a.m. on July 21, 1986, his supervisor picked him up at his residence and drove him to the Moon Restaurant, where he worked as a cook until about 3 p.m. After that, he and some friends played cards and drank beer at the restaurant until about 6:30 p.m., when a friend drove him back home. At home he took a shower, drank another beer, and then fell asleep on the bed. Sometime later that night, his wife came home and woke him up, stating that people were near his car, which was a gray Cadillac parked at the rear of his residence at 1247 South Pulaski. Defendant then went outside, where he was subsequently arrested. Although defendant admitted that exhibit 1 depicted his gray Cadillac as it was parked outside his home and that he had possessed the keys to this vehicle at the time of his arrest, he denied that he had driven the car at all that day. He further denied that he was intoxicated at the time of his arrest. He claimed that the officers never asked him to perform any sobriety tests or submit to breath, blood or urine tests.

After hearing argument, the trial court found defendant guilty of driving while intoxicated and reckless homicide. On appeal, defendant questions the sufficiency of the evidence, claiming that the State failed to show beyond a reasonable doubt that his actions were reckless or that the victim's death resulted from the injuries sustained from being struck by his automobile. Defendant claims that the evidence at trial clearly showed that the ambu bag used to ventilate the victim was defective and that the malfunctioning ambu bag constituted a supervening cause of the victim's death.

■ A conviction for reckless homicide (Ill. Rev. Stat. 1985, ch. 38, par. 9–3) requires proof beyond a reasonable doubt that the defendant unintentionally killed another individual without lawful justification by the reckless use of a motor vehicle. (*People v. Jackson* (1987), 118 Ill. 2d 179, 189, 514 N.E.2d 983; *People v. Gittings* (1985),

136 Ill. App. 3d 655, 659, 483 N.E.2d 553.) A person acts recklessly when he consciously disregards a substantial or unjustifiable risk that his acts will cause death or great bodily harm to another or where such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in a given situation. (*People v. Gittings*, 136 Ill. App. 3d at 659.) Proof that the defendant operated his motor vehicle at an excessive rate of speed is not, by itself, sufficient indicia of recklessness. (*People v. Ziegler* (1979), 78 Ill. App. 3d 490, 496, 396 N.E.2d 1160.) But when combined with other circumstances, excessive speed may indicate a conscious disregard of the risk of serious harm to others. (*People v. Boyle* (1979), 78 Ill. App. 3d 791, 797, 396 N.E.2d 1347.) Proof that defendant was under the influence of alcohol at the time of an alleged violation is, however, *prima facie* evidence of a reckless act. Thus, a conviction for driving under the influence of alcohol (DUI) is *prima facie* evidence of recklessness that may only be rebutted by evidence that, despite the influence of alcohol, the acts committed by defendant were not performed recklessly. *People v. Jackson*, 118 Ill. 2d at 190-91.

■ In the present case, the State presented ample evidence that defendant operated his automobile recklessly by driving while under the influence of alcohol and at an excessive rate of speed. The testimony adduced at trial showed that the speed limit in the vicinity of Pulaski Road where the accident took place was 30 miles per hour. Even if we were to discount Rice's opinion testimony that defendant was traveling at 60 or 70 miles per hour, both he and Jones indicated that defendant appeared to be driving at a rate of speed above the speed limit. Furthermore, there was sufficient evidence that defendant was highly intoxicated at the time he operated his vehicle. Both Rice and Officer Kulbida testified at length as to defendant's condition upon his arrest, which occurred just moments after the accident. Additionally, the evidence that defendant struck the victim without attempting to swerve away from him, as well as the fact that defendant failed to slow down at the intersection before or after striking the victim, is also indicative of recklessness.

Consequently, we find that the evidence fully supports the trial court's finding that defendant operated his motor vehicle in a reckless fashion. The evidence which tended to show that the victim was also intoxicated and that he stepped into the path of defendant's oncoming vehicle does not, in our opinion, diminish the recklessness of defendant's acts since defendant failed to rebut with any credible evidence the evidence of his extreme intoxication at the time of the incident and its contribution to the accident.

We now consider whether the State failed to prove the causation element of reckless homicide, that is, whether the State failed to show that the victim's death resulted from defendant's reckless acts and not some supervening factor.

Defendant concedes that the State need not prove that his acts were the sole and immediate cause of death, but only that his acts were a contributing cause of death and that death did not occur as a result of a supervening cause, separate and unconnected to his actions. (*People v. Gruner* (1985), 130 Ill. App. 3d 1042, 474 N.E.2d 1355.) Defendant contends, however, that the evidence adduced at trial concerning the defective ambu bag and its malfunction on July 25, 1986, constituted such independent intervening cause. We disagree.

It has long been established that when the State has shown the existence, through the act of the accused, of a sufficient cause of death, the death is presumed to have resulted from such act, unless it can be shown that death was caused by a supervening act disconnected from any act of the accused. (*People v. Meyers* (1945), 392 Ill. 355, 64 N.E.2d 531.) Furthermore, when a defendant causes serious, life-threatening injuries to another, he cannot exonerate or insulate himself from the consequences of his actions by showing that the victim's death resulted from unskilled or improper medical treatment. (*People v. Stamps* (1972), 8 Ill. App. 3d 896, 291 N.E.2d 274.) Unskilled or improper medical treatment which may aggravate the victim's preexisting condition or contribute to the victim's death is considered reasonably foreseeable and, thus, does not constitute an intervening act, unless the treatment is so bad that it can be classified as gross negligence or intentional malpractice. *People v. Gulliford* (1980), 86 Ill. App. 3d 237, 407 N.E.2d 1094.

In the present case, there was abundant evidence that defendant's act of striking the victim with his automobile caused the victim to suffer serious, life-threatening injuries. Upon his admission to the Cook County Hospital Trauma Unit, he was classified at a grade four, *i.e.*, seriously injured with only a chance of survival. Although the victim was stabilized, he remained in critical condition throughout, until his death on August 5, 1986. The evidence presented at trial did not conclusively establish that the ambu bag, although defective in that it contained two valves rather than one, did actually malfunction. The same ambu bag was used by the victim since his admission on July 21, 1986. Thus, the possibility that the dual valves caused the ambu bag to spontaneously malfunction on July 25, 1986, is remote. The greater weight of the evidence supported the conclusion that the ambu bag,

even though defective, had no significant relationship to, and did not bring about, the victim's cerebral hypoxic episode on July 25, 1986. However, even if a malfunctioning ambu bag did instigate the reduced heart rate which ultimately led to the cerebral hypoxic episode and even if this episode did contribute to the victim's death, such circumstances would not exonerate defendant since the defective ambu bag did not constitute gross negligence or intentional malpractice. The record clearly indicates that the victim obtained exemplary medical care and that he ultimately succumbed to his multiple, serious injuries despite all efforts to keep him alive.

Finally, we note that it is the trier of fact's duty to resolve all conflicts raised by the evidence, and we could not substitute our opinion, even if we were so inclined. (*People v. Titone* (1986), 115 Ill. 2d 413, 505 N.E.2d 300.) Our review is limited to a determination of whether any rational trier of fact could have found that all the essential elements of the offense were proven beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 538 N.E.2d 453.) In light of this standard, we do not find the evidence so improbable or unsatisfactory that we feel compelled to reverse the decision of the trial court.

Therefore, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

CERDA, P.J., and WHITE, J., concur.