# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Mars*, 2012 IL App (2d) 110695

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARK R. MARS, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2-11-0695 |
| Filed<br>Modified upon<br>denial of rehearing | December 26, 2012<br><br>February 25, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | A *pro se* postconviction petition alleging that defendant's appellate counsel was ineffective in failing to raise the issues of whether the murder indictment was subject to compulsory joinder and that defendant's right to a speedy trial was violated was properly dismissed at the first stage of the proceedings. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 05-CF-557; the Hon. John T. Phillips, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Alan D. Goldberg and Shawn O'Toole, both of State Appellate Defender's Office, of Chicago, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (Lawrence M. Bauer and Victoria E. Jozef, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Panel

JUSTICE ZENOFF delivered the judgment of the court, with opinion.
Justices Hudson and Birkett concurred in the judgment and opinion.

**OPINION**

¶ 1        Defendant, Mark R. Mars, appeals from an order of the circuit court of Lake County dismissing his postconviction petition at the first stage. We affirm.

¶ 2                                                     BACKGROUND

¶ 3        On March 2, 2005, the grand jury indicted defendant on one count of first-degree murder, alleging that he caused the death of a taxi driver, Lee Jones, while committing the forcible felony of aggravated robbery (720 ILCS 5/18-5(a) (West 2004)). In July 2007, the State indicted defendant on two additional counts (counts II and III) of first-degree murder, based upon the forcible felonies of attempted aggravated robbery (720 ILCS 5/8-4(a), 18-5(a) (West 2004)) and attempted robbery (720 ILCS 5/8-4(a), 18-1(a) (West 2004)). Defendant moved to dismiss counts II and III of the indictment on the grounds of denial of due process and denial of a speedy trial. The trial court granted defendant's motion but then reversed itself when it granted the State's motion to reconsider. All three counts of the indictment were presented to the jury. The following facts pertinent to this appeal were adduced at trial.

¶ 4        In the late evening hours of January 31, 2005, defendant was riding in a cab driven by the victim. During the ride from Waukegan, Illinois, to North Chicago, Illinois, defendant unsuccessfully demanded money from the victim and stabbed the victim in the head, shoulder, and right arm. This was at 2:15 a.m. on February 1, 2005. When the victim's front-seat passenger and coworker, Motyka Gibson, called in a robbery in progress, defendant jumped out of the cab and ran away. Gibson later identified defendant to the police as the perpetrator from a photo lineup.

¶ 5        The victim was taken by ambulance from the scene to St. Therese Hospital in Waukegan. He was admitted to the emergency room at 3:57 a.m. Nurse Dolores Kilpatrick remembered him as a large, African-American gentleman with cuts to the back of his head and on his arms. According to Kilpatrick, the victim was "scared, but then he really didn't want us to

take care of him properly." Kilpatrick testified that the victim would not allow the doctor to stitch his wounds. At 4:30 a.m. the victim was discharged.

¶ 6    Lorraine Jones, the victim's wife, testified that the victim came home on February 1, 2005, between 2 a.m. and 4 a.m. in a "wrapped up, bloody" condition. She noted that a cut on his right arm on top of the wrist kept bleeding. Over the next 24 hours, the victim was in a lot of pain and was "delirious," his right arm turned blue, green, and red, and it was significantly swollen. The next day, February 2, the victim's right arm turned black. Jones testified that the fingers turned black first and then the blackness went up the arm. Jones rubbed the arm with warm cloths, and when that did not ease the condition, she accompanied the victim to Kenosha Memorial Hospital in Kenosha, Wisconsin (they lived in Kenosha), where they arrived between 11 a.m. and 1 p.m. They waited for a while before the victim was seen in an examining room.

¶ 7    Dr. Suzanne Siegel was the emergency room physician who attended the victim. She testified that the victim's complaint was of arm pain–he reported that he had been hit with a heavy object–but when a physician's assistant checked the victim's blood sugar, it was very high and Dr. Siegel took over the case. Because the arm X rays were negative, the hospital staff treated the injury as a "soft tissue" injury, iced the arm, and elevated it. The victim was given morphine for the pain. According to Dr. Siegel, she observed small scratches and abrasions on the victim's arms but nothing that required stitches. Dr. Siegel testified that she shifted her focus to caring for the victim's diabetes, which he had reported. She administered intravenous (IV) fluids and insulin. According to Dr. Siegel, the victim resisted treatment and pulled out the IVs. Both Dr. Siegel and Jones kept trying to convince him to stay in the hospital and continue his therapy. However, the victim checked himself out against medical advice.

¶ 8    Jones had already left the hospital, so the victim took a cab home. He was in pain, lying on the stairs when Jones got home. She helped him inside. She saw that the blackness on his right arm had reached his bicep. Three hours later, a friend took the victim to St. Catherine's hospital in Kenosha. The victim presented himself at St. Catherine's at 11:02 p.m. From St. Catherine's, the victim was taken to a hospital in Milwaukee, Wisconsin, where he died of sepsis due to necrotizing fasciitis (flesh-eating disease), following the surgical amputation of his right arm at the shoulder.

¶ 9    Dr. Jeffrey Jentzen, a forensic pathologist and the medical examiner for Milwaukee County, performed an autopsy on the victim. Dr. Jentzen observed bruising and lacerations to the back of the head. According to Dr. Jentzen, the victim suffered a blunt force injury to the skull. Dr. Jentzen also examined the severed right arm. He observed a wound, also described as a "cut," in the right arm. There were also surgical incisions on the forearm and the back of the hand. These were fasciotomy incisions made by the surgeons to relieve pressure caused by swelling due to infection. Dr. Jentzen further observed necrotic tissue. Dr. Jentzen opined that a break in the tissue of the right arm allowed bacteria into the tissues that caused necrotizing fasciitis, which–almost always fatal–caused the victim's death. Dr. Jentzen testified that the cut on the right arm was the "direct" cause of the sepsis.

¶ 10    The jury found defendant not guilty on count I of the indictment (felony murder

predicated on aggravated robbery) and not guilty on count II (felony murder predicated on attempted aggravated robbery), but found him guilty on count III (felony murder predicated on attempted robbery). The trial court sentenced defendant to 43 years' imprisonment. This court affirmed on direct appeal (*People v. Mars*, No. 2-08-0251 (2009) (unpublished order under Supreme Court Rule 23)).

¶ 11   On March 11, 2011, defendant filed a *pro se* petition for postconviction relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2010)). Defendant alleged, *inter alia*, that his appellate counsel rendered ineffective assistance for failing to argue that the victim's sepsis was not causally related to the attempted robbery. Defendant also contended that his trial counsel was ineffective because he failed to challenge the sufficiency of the grand jury indictment, which "omitted essential elements of the charges." On June 8, 2011, the trial court dismissed the petition on the grounds that the petition was submitted without a notarized affidavit and that the petition was frivolous and patently without merit. Defendant timely appealed.

¶ 12                                    ANALYSIS

¶ 13   Defendant contends that the trial court erred in dismissing his petition at the first stage, because the petition sufficiently alleged that appellate counsel was ineffective for not challenging the State's causation evidence and for not arguing that the 2007 indictment should have been dismissed because it charged offenses subject to compulsory joinder with the 2005 indictment and violated defendant's right to a speedy trial. The Act provides a method for a criminal defendant to assert that his or her conviction was the result of "a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1(a)(1) (West 2010); see *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). A defendant commences proceedings under the Act by filing a petition in the circuit court in which the original proceeding occurred. *Hodges*, 234 Ill. 2d at 9. The Act provides for three stages of proceedings. *Hodges*, 234 Ill. 2d at 10. At the first stage, the trial court shall dismiss the petition in a written order if it determines that the petition is frivolous or is patently without merit. *Hodges*, 234 Ill. 2d at 10. If the petition progresses to the second stage, counsel may be appointed for an indigent defendant, and the State may answer or move to dismiss. 725 ILCS 5/122-4, 122-5 (West 2010). If the defendant makes a "substantial showing" of a constitutional violation at the second stage, then the petition proceeds to a third-stage evidentiary hearing. 725 ILCS 5/122-6 (West 2010). We review *de novo* the dismissal of a postconviction petition without an evidentiary hearing. *People v. Kirkpatrick*, 2012 IL App (2d) 100898, ¶ 13.

¶ 14   Here, the trial court dismissed defendant's petition at the first stage. One of the bases for the dismissal was that the affidavit verifying the petition was not notarized. The State argues that we may affirm on this basis. Defendant asserts that our decision in *People v. Turner*, 2012 IL App (2d) 100819, ¶ 47, precludes affirmance on this ground. In *People v. Carr*, 407 Ill. App. 3d 513 (2011), this court held that the defendant's failure to have the affidavit verifying his postconviction petition notarized rendered the petition invalid. *Carr*, 407 Ill. App. 3d at 515-16. However, we refused to follow *Carr* in *Turner* and agreed instead with

the First and Fourth Districts of the Appellate Court, which held that lack of notarization is not a ground for affirming a first-stage dismissal. *Turner*, 2012 IL App (2d) 100819, ¶¶ 31-32. The State now urges us to repudiate *Turner* as having been wrongly decided, while defendant contends that the weight of authority has shifted in his favor since we decided *Carr*. Defendant argues that *Turner* was correctly decided. Here, because the trial court also reached the merits and dismissed defendant's petition as frivolous and patently without merit, we need not address the issue of lack of notarization. Instead, we will move directly to a consideration of the merits of this appeal.

¶ 15    Defendant first contends that gross medical negligence was a supervening cause of the victim's death and that appellate counsel was ineffective for not raising that issue on direct appeal. Under the two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed on a claim of ineffective assistance of counsel, a defendant must show that his counsel's performance was deficient, in that it fell below an objective standard of reasonableness, and that counsel's deficient performance prejudiced the defendant. *People v. Houston*, 226 Ill. 2d 135, 144 (2007). Prejudice is shown by demonstrating that, but for counsel's deficient performance, there is a reasonable probability that the result of the proceeding would have been different. *Houston*, 226 Ill. 2d at 144. A reasonable probability that the result of the proceeding would have been different is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694; *Houston*, 226 Ill. 2d at 144. Failure to satisfy either prong of the *Strickland* test defeats an ineffective-assistance claim. *Strickland*, 466 U.S. at 697; *Houston*, 226 Ill. 2d at 144-45. The *Strickland* principles apply to appellate counsel. *People v. Cathey*, 2012 IL 111746, ¶ 23.

¶ 16    It has long been established that when the State has shown the existence, through the act of the accused, of a sufficient cause of death, the death is presumed to have resulted from such act, unless it can be shown that the death was caused by a supervening act disconnected from any act of the accused. *People v. Meyers*, 392 Ill. 355, 359 (1945); *People v. Robinson*, 199 Ill. App. 3d 494, 503 (1990). If death results indirectly from a blow through a chain of natural causes, unchanged by human action, the blow is regarded as the cause of death. *Meyers*, 392 Ill. at 360. The injury inflicted by an accused need not be the sole or immediate cause of death in order to constitute the legal cause of death. *People v. Dixon*, 78 Ill. App. 3d 73, 78 (1979).

"[W]here a person inflicts upon another a wound which is dangerous, calculated to endanger or destroy life, it is no defense to a charge of homicide that the alleged victim's death was contributed to by, or immediately resulted from, unskilled or improper treatment of a wound or injury by attending physicians or surgeons." *Dixon*, 78 Ill. App. 3d at 79.

This is so because the death is caused by the cooperation of the initial assault as well as the failure to prevent the assault from resulting in death. *People v. Griffin*, 578 N.Y.S.2d 782, 784 (N.Y. App. Div. 1991). Put another way:

" 'But if a man receives a wound, which is not in itself mortal, but either for want of helpful applications, or neglect thereof, it turns to a gangrene, or a fever, and that gangrene or fever be the immediate cause of his death, yet, this is murder or

-5-

manslaughter in him that gave the stroke or wound, for that wound, tho it were not the immediate cause *** thereof, and the fever or gangrene was the immediate cause of his death, yet the wound was the cause of the gangrene or fever, and so consequently is causa causati.' " *United States v. Hamilton*, 182 F. Supp. 548, 550 (D.C. Cir. 1960) (quoting 1 Matthew Hale, Pleas of the Crown 427 (1736)).

¶ 17    Once the State establishes a sufficient legal proximate cause of death through an act for which the defendant is responsible, a presumption arises that the death resulted from the culpable act of the defendant. *People v. Gulliford*, 86 Ill. App. 3d 237, 242 (1980). The presumption then must be rebutted by the defendant's presentation of contrary evidence that the *sole* cause of death was the intervening gross negligence of physicians. *Gulliford*, 86 Ill. App. 3d at 242. Unskilled or improper medical treatment that aggravates a victim's preexisting condition or contributes to the victim's death is considered reasonably foreseeable and does not constitute an intervening act unless the treatment is so bad that it can be classified as gross negligence or intentional malpractice. *Robinson*, 199 Ill. App. 3d at 503. Gross negligence or intentional medical maltreatment constitutes a valid defense where it is disconnected from the culpable act of the defendant, because the intervening conduct is abnormal and not reasonably foreseeable. *Gulliford*, 86 Ill. App. 3d at 241.

¶ 18    In the present case, defendant argues that Kenosha Memorial's failure to treat the sepsis that entered the victim's body through the cut in his arm was an independent cause of death relieving defendant of responsibility for the victim's demise. In other words, defendant claims that the victim did not die from the wound inflicted during the attempted robbery, but died as a result of gross medical negligence, that being Kenosha Memorial's failure properly to treat the victim's arm.

¶ 19    At this point, earlier in our discussion rather than later, the law of causation needs to be clarified, because it is defendant's position that *Gulliford* stands for the proposition that in all instances gross medical negligence breaks the chain of causation and exonerates an accused from criminal liability for his acts. Defendant misreads *Gulliford*. In *Gulliford*, the defendant was accountable for the act of his accomplice, who struck the victim in the head with a pipe during a robbery attempt and inflicted a wound so grievous that it resulted in a coma. *Gulliford*, 86 Ill. App. 3d at 240. While the victim was comatose, his lungs collected secretions that caused pneumonia. *Gulliford*, 86 Ill. App. 3d at 240-41. According to the pathologist, the victim's immediate cause of death was pneumonia. *Gulliford*, 86 Ill. App. 3d at 240. On appeal, the defendant argued that the victim's attending neurosurgeon's failure to treat the pneumonia was a supervening cause of death, relieving the defendant of legal responsibility. *Gulliford*, 86 Ill. App. 3d at 240. The appellate court disagreed for two reasons: (1) there was no evidence in the record to establish gross negligence or intentional malpractice on the part of the treating physicians; and (2) "the alleged act or omission of the victim's physicians was not disconnected from the culpable act of striking the victim." *Gulliford*, 86 Ill. App. 3d at 241. In order to drive point (2) home, *Gulliford* then repeated, "As aforesaid, a supervening act will not relieve an accused from responsibility for death of another unless that act is disconnected from the act of the accused." *Gulliford*, 86 Ill. App. 3d at 241. *Gulliford* further explained:

"The record supports the conclusion that the direct and proximate result of [the victim's]

-6-

head injuries was the onset of pneumonia from which he ultimately died. The death of [the victim] was a natural and foreseeable consequence of the blow to the victim's head and the resulting dangerous wound. The legal chain of causation from the blow to the head and the ultimate death was unbroken under the facts presented to us, and '[t]he attending physicians and the family of the victim owe no duty to the defendant to treat the victim so as to mitigate the defendant's criminal liability. The defendant's desire to mitigate his liability may never legally override, in whole, or in part, the decisions of the physicians and the family regarding the treatment of the victim.' " *Gulliford*, 86 Ill. App. 3d at 242 (quoting *In re J.N.*, 406 A.2d 1275, 1282 (D.C. 1979)).

¶ 20    Similarly, defendant's reliance on *People v. Brackett*, 117 Ill. 2d 170 (1987), is misplaced. In *Brackett*, our supreme court underscored the point made in *Gulliford* when it stated that "[t]he courts in Illinois have repeatedly held that an intervening cause *completely unrelated* to the acts of the defendant does relieve a defendant of criminal liability." (Emphasis added.) *Brackett*, 117 Ill. 2d at 176. Thus, when the broken rib and other injuries inflicted by the defendant on the 85-year-old victim during a rape and robbery caused the victim to become weak and aspirate her food, the fact that her death was due to asphyxiation did not exonerate the defendant. *Brackett*, 117 Ill. 2d at 178 ("[T]he victim's depressed, weakened, debilitated state was the direct result of the trauma associated with the attack upon her. *** It was [the doctor's] opinion that she became too weak even to swallow."). Therefore, in order for defendant to show that the victim's death in our case was due to a supervening cause relieving him of responsibility, he must show that the victim's treatment at Kenosha Memorial was grossly negligent and that the victim's death was completely unrelated to any act of defendant's.

¶ 21    We first look at what defendant argues is evidence of gross medical negligence. Defendant's opening brief cites *Walski v. Tiesenga*, 72 Ill. 2d 249 (1978), which held that a standard of care must be established through expert testimony except where the common knowledge of laymen is sufficient to recognize or infer negligence. *Walski*, 72 Ill. 2d at 257. The types of malpractice claims actionable without expert medical testimony are claims of sponges left in the abdomen, instruments left after surgery, and X ray burns. *Walski*, 72 Ill. 2d at 257. At trial, defendant did not present expert testimony of medical malpractice or proffer expert testimony that gross medical negligence was the sole cause of the victim's death. Defendant's trial theory appeared to be that the victim's myriad medical problems, including diabetes, heart problems, obesity, and cancer, as well as his refusal of treatment, led to his death. Consequently, defendant must establish that the facts surrounding the victim's visit to Kenosha Memorial allow us to infer gross medical negligence.

¶ 22    Dr. Siegel testified that the victim presented himself at Kenosha Memorial on February 2, 2005, at 9:30 a.m. complaining of arm pain. According to Dr. Siegel, the victim stated that he had been hit by an object. Dr. Siegel did not recall "any major break in the skin." She testified that she saw some "small abrasions." She said that there were "[n]o major cuts in the arm." She described the abrasions as "small scratches" that did not need stitches. The evaluation of the arm included X rays to determine whether there were any broken bones. The X rays were negative, so Dr. Siegel treated the arm for a "soft tissue" injury by keeping it elevated and iced, and she prescribed morphine for the pain. Throughout the day, Dr.

Siegel examined the victim's arm "several times" to make sure he was keeping the arm elevated, which he did not want to do. Dr. Siegel saw nothing about the arm that required urgent care. She testified that she observed the arm "repeatedly for cuts and swelling."

¶ 23 Initially, the victim was seen on the urgent-care side of the facility, but when his blood sugar was found to be elevated, the victim was moved to the acute-care side, where Dr. Siegel saw him. The victim had reported that he was diabetic. At that point, according to Dr. Siegel, there was a change in the focus of treatment from the arm to the diabetes. Dr. Siegel testified that she was "very concerned" about the victim's high heart rate and high blood sugar. According to Dr. Siegel, once the victim's arm X rays were negative, she felt that the high heart rate and "his sugars" were more life threatening. Dr. Siegel testified that the victim several times pulled out his IVs, and she and Jones had to convince the victim to continue with the treatment.

¶ 24 Dr. Robert Fields was the emergency room physician at Kenosha Memorial who came on shift after Dr. Siegel. Dr. Siegel had endorsed the victim to Dr. Fields' care. Dr. Fields reviewed the victim's chart and spoke with Dr. Siegel. His recollection of the victim's symptoms was "very vague," only that the victim was clinically sick and was being treated for diabetic ketoacidosis. Dr. Fields recalled a problem with the victim's arm, but nothing specific about it. Shortly before 5:57 p.m., the victim indicated that he was going to leave the hospital. Dr. Fields testified that he conveyed to the victim that he was "very ill" and should stay in the hospital for further care. Dr. Fields warned the victim that if he left the hospital his "different medical problems" could worsen and he could die. Nevertheless, at 5:57 p.m., the victim left the hospital against medical advice.

¶ 25 At oral argument, defendant made a number of assertions about the evidence that are not borne out by the record. First, he argued that the physicians at Kenosha Memorial watched the victim's arm turn black. Dr. Siegel and Dr. Fields were the only two physicians from Kenosha Memorial who testified, and neither of them testified that they watched the arm turn black or that they observed that it was black. Second, defendant asserted that Dr. Siegel saw "cuts" on the victim's arm. Dr. Siegel testified that she saw "small abrasions" and "small scratches." She specifically said that there were no major cuts on the arm. Third, defendant asserted that, after the victim checked himself out of Kenosha Memorial, he exclaimed to Jones that he had checked himself out because Kenosha Memorial would not treat his arm. What Jones testified to was that "[the victim] told [her] that they wouldn't treat him and he got really mad because they had him on a gurney." The victim did not say anything to Jones about the doctors' failure to treat his arm.

¶ 26 Given that the victim did not report that he had been stabbed in the arm; that Dr. Siegel did not see anything other than small scratches and small abrasions; that X rays of the arm were negative; and that the victim's diabetic condition was potentially life threatening, we disagree that the claims of negligence in the instant case are as transparent as a sponge left in the abdomen. We do not believe that laymen could infer gross negligence. However, even if we were to say that the treatment was grossly negligent, defendant still would have to show that the victim died of a cause completely unrelated to the stab wound in the arm.

¶ 27 According to the death certificate in evidence, the victim died at 4 p.m. on February 3,

2005. The immediate cause of death listed was "sepsis due to necrotizing fasciitis right arm due to incised injury to right arm due to physical assault." "Diabetes mellitus" was listed as an "other significant condition." The manner of death was listed as "homicide." According to Dr. Jentzen, sepsis is an infection that gets into the bloodstream and causes a "cascade effect," culminating in low blood pressure, heart failure, and death. Dr. Jentzen testified that "necrotizing fasciitis" is an infection that travels through the muscle tissues and the spaces where the fascia holds the muscle in place. Dr. Jentzen stated that necrotizing fasciitis is a "rapidly-ascending infection." When asked if it could have killed the victim within 60 hours of the attack, Dr. Jentzen answered, "That would be a classic case, yes." Dr. Jentzen testified that the necrotizing fasciitis originated at the site of the injury to the victim's right arm, which the doctor described as a cut. The infection streaked up the arm and began to affect the lateral portion of the victim's right chest. In the doctor's opinion, "[T]he direct cause of death was the incised wound to the arm causing necrotizing fasciitis resulting in sepsis." Although Dr. Jentzen used the words "incised wound," it is clear that he was not talking about the fasciotomy incisions the surgeons made to relieve pressure, because the sepsis was already present when the fasciotomy incisions were made. Dr. Jentzen testified that, "but for" the wound in the right arm, the victim would not have gotten necrotizing fasciitis. According to Dr. Jentzen, the victim's diabetes was a risk factor for perpetuating the infection, but did not, of itself, cause death. According to Dr. Jentzen, the victim's heart problems, obesity, and cancer had no role in the death.

¶ 28 In this appeal, defendant accepts Dr. Jentzen's opinion that sepsis due to necrotizing fasciitis was the cause of death, but he argues that the medical staff at Kenosha Memorial was solely responsible because of the failure to properly treat the arm. Defendant adduced no evidence at trial that Dr. Siegel's treatment fell below the standard of care, and for the reasons stated above, we believe that expert testimony on the standard of care was necessary. Dr. Siegel testified that she observed scratches and abrasions but no major cuts and that the victim himself reported only that he had been hit with an object. When the X rays were negative, she treated the arm by elevating it and icing it, and she checked on the arm several times during the victim's hospital stay. Of importance, Dr. Jentzen was not asked by either party whether, given the victim's statement of what happened and Dr. Siegel's observations of the arm, Dr. Siegel overlooked the sepsis. Therefore, defendant's entire premise is pure speculation. More important, any delay in treatment could not have been the *sole* cause of death, because the undisputed evidence was that the infection entered through the wound defendant caused. Dr. Jentzen was clear that, "but for" the cut inflicted by defendant, the infection would not have entered the victim's body. Defendant set the chain of events into motion, and any supposed delay in treatment cannot legally amount to a supervening cause. As the court in *Griffin* stated:

"The factual situation is in legal effect the same, whether the victim of a wound bleeds to death because surgical attention is not available or because, although available, it is delayed by reason of the surgeon's gross neglect or incompetence. *The delay in treatment is not in fact an intervening force; it cannot in law amount to a supervening cause.*" (Emphasis in original.) (Internal quotation marks omitted.) *Griffin*, 578 N.Y.S.2d at 784.

¶ 29 This principle is illustrated in *People v. McGee*, 187 P.2d 706 (Cal. 1947). In *McGee*, the

California Supreme Court held that the defendant was not prejudiced by the trial court's exclusion of his expert's proposed testimony that the victim would not have died of a bullet wound inflicted by the defendant if the attending surgeon had not, grossly contrary to proper surgical practice, failed for more than 10 hours after the victim's admission to the hospital to take any action to control the hemorrhage from the bullet wound. *McGee*, 187 P.2d at 715. In its analysis, the California Supreme Court assumed that the 10-hour delay in treatment was gross negligence and that the victim's life might have been saved by prompt and proper surgical treatment. *McGee*, 187 P.2d at 715. Even assuming gross medical negligence, the court said that the delay in treatment would not be, in fact, an intervening force, because death was a consequence of the defendant's criminal act. *McGee*, 187 P.2d at 715. This is consistent with Illinois law. *Gulliford* held that, for the defendant to escape liability, the alleged act or omission of a victim's physicians must be disconnected from the culpable act of the defendant. *Gulliford*, 86 Ill. App. 3d at 241.

¶ 30  Defendant relies on *People v. Stewart*, 358 N.E.2d 487 (N.Y. 1976). In *Stewart*, the defendant was charged with stabbing and killing the victim. *Stewart*, 358 N.E.2d at 489. The victim underwent surgery, and the knife wound was repaired. *Stewart*, 358 N.E.2d at 489. The surgeons then set about repairing a hernia that was unrelated to the stabbing, when the victim went into cardiac arrest and died a month later. *Stewart*, 358 N.E.2d at 490. At trial, the pathologist testified to the medical reports in which the surgeons blamed the anesthesiologist for failing to ventilate the victim, causing his cardiac arrest. *Stewart*, 358 N.E.2d at 490. On cross-examination, the pathologist conceded that, if the anesthesiologist was not doing his job, that alone could have been the cause of death. *Stewart*, 358 N.E.2d at 490-91. On appeal, the defendant's manslaughter conviction was reduced to assault, because the hernia operation during which the victim suffered cardiac arrest was unrelated to the stab wound and because, if the anesthesiologist failed to provide oxygen to the victim, that alone could have been the cause of death. *Stewart*, 358 N.E.2d at 492. *Stewart* is inapplicable. In our case, Dr. Jentzen never testified that the sepsis might have been, or was, caused by gross medical negligence, and the facts as we know them do not lead to that conclusion. Additionally, the surgeons in *Stewart* were operating on a hernia that was unconnected to the stabbing when the cardiac arrest caused by malpractice occurred. Moreover, defendant attempts to take *Stewart* too far when he argues that the rule is that gross medical negligence exonerates a defendant. In *In re Anthony M.*, 471 N.E.2d 447 (N.Y. 1984), the New York Court of Appeals cited *Stewart* and then cited the rule: "Even an intervening, independent agency will not exonerate [a] defendant unless 'the death is solely attributable to the secondary agency, and not at all induced by the primary one.' " *Anthony M.*, 471 N.E.2d at 452 (quoting *People v. Kane*, 107 N.E.2d 260, 270 (N.Y. 1915)). *Griffin* offers the example of a negligent administration of a deadly poison as an independent act that will break the chain of causation. *Griffin*, 578 N.Y.S.2d at 783. Here, the legal chain of causation connecting the stab wound to the victim's arm, inflicted by defendant, to the victim's ultimate death was unbroken. Consequently, defendant has not set forth an arguable basis under the first *Strickland* prong, that his appellate counsel's performance was deficient, because his legal theory that gross medical negligence is always a supervening act relieving a defendant of culpability is indisputably meritless. As defendant failed to set forth an

arguable basis that counsel's performance was deficient, we need not consider whether he was prejudiced by counsel's performance.

¶ 31　　Defendant's second contention of appellate counsel's ineffective assistance is counsel's failure on direct appeal to argue that the trial court erred in not dismissing the 2007 indictment, because it was subject to compulsory joinder with the 2005 indictment and violated defendant's right to a speedy trial. The State argues that the issue is forfeited, because it was not raised in the postconviction petition. Defendant responds that the petition, if read liberally, raised the issue. The allegation in the petition on which defendant relies is the following:

> "Defense counsel failed to challenge the sufficiency of the grand jury indictment which omitted essential elements of the charges. But for, [*sic*] counsel's ineffective assistance of counsel's [*sic*] no trier of fact could have found petitioner guilty beyond any reasonable doubt of first degree murder."

¶ 32　　A *pro se* petitioner is not required to allege facts supporting all elements of a constitutional claim. *People v. Mescall*, 403 Ill. App. 3d 956, 962 (2010). Petitions filed *pro se* must be given a liberal construction and are to be viewed with a lenient eye, allowing borderline cases to proceed. *Mescall*, 403 Ill. App. 3d at 962. Because a *pro se* defendant will likely be unaware of the precise legal basis for his claim, the threshold for survival is low, and a *pro se* defendant need allege only enough facts to make out a claim that is arguably constitutional for purposes of invoking the Act. *Hodges*, 234 Ill. 2d at 9. However low the threshold, the petition must "clearly set forth" the respects in which the petitioner's constitutional rights were violated. (Internal quotation marks omitted.) *Hodges*, 234 Ill. 2d at 9. This means that the pleading must bear some relationship to the issue raised on appeal. Liberal construction does not mean that we distort reality.

¶ 33　　In the present case, defendant's *pro se* petition alleged that his "defense counsel" was ineffective for not challenging the indictment on the basis that it lacked essential elements of the crimes charged. No matter how liberally we construe the above allegation, viewing it in context, we cannot conclude that by this allegation defendant actually raised a claim relating to *appellate* counsel's failure on direct appeal to raise the issue of compulsory joinder and violation of his right to a speedy trial. Defendant alleged in the first sentence that the indictment lacked the essential elements to state an offense. In the second sentence, he concluded that the defective indictment would have prevented the jury from finding him guilty, had his counsel raised the issue. Clearly, defendant was addressing the failure of his trial counsel to bring the allegedly faulty indictment to the trial court's notice and that failure's consequences at trial. In contrast, defendant explicitly referred to errors of appellate counsel throughout the document when complaining of deficiencies in his direct appeal. Defendant's *pro se* petition as a whole is an organized, coherent document. It sets forth the record facts in a logical fashion with appropriate record citations and raises specific legal challenges with regard to appellate counsel, such as counsel's failure to raise a "Brady Violation" and the State's failure to connect him to the sepsis that killed the victim. In short, we do not have to comb through a morass of irrelevancies to try to figure out what defendant meant to raise as constitutional violations. He was aware of legal concepts, such as a *Brady* violation, and he was capable of articulating the type of relief he thought he was entitled to,

such as reversal on appeal. Moreover, the subject matter raised in the above-quoted allegation could not have been compulsory joinder and speedy trial in the context of something his trial attorney failed to do, because trial counsel actually did bring a motion to dismiss the 2007 indictment based on compulsory joinder and violation of defendant's right to a speedy trial. Thus, we agree with the State that the issues of compulsory joinder and speedy trial are forfeited as they were not raised in the postconviction petition. Accordingly, for the reasons set forth above, we affirm the trial court's first-stage dismissal of the postconviction petition.

¶ 34　　　Affirmed.