NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 180839-U

NO. 4-18-0839

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 16, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Adams County |
| CHARLES W. ARMOUR, | ) | No. 14CF245 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Robert K. Adrian, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Knecht and Cavanagh concurred in the judgment.

**ORDER**

¶ 1     *Held*:   The circuit court did not err by dismissing defendant's *pro se* postconviction
petition at the first stage of the proceedings.

¶ 2     Defendant, Charles W. Armour, appeals the December 4, 2018, order of the

Adams County circuit court, summarily dismissing his *pro se* postconviction petition as frivolous

and patently without merit.  Defendant contends the circuit court's dismissal was erroneous

because three of his allegations of ineffective assistance of counsel state the gist of a

constitutional claim.  We affirm.

¶ 3                                   I. BACKGROUND

¶ 4     On April 21, 2014, the State charged defendant by information with aggravated

domestic battery (720 ILCS 5/12-3.3(a) (West 2014)) and aggravated battery (720 ILCS

5/12-3.05(b)(2) (West Supp. 2013)).  Both counts alleged defendant repeatedly struck his son,

A.A., with a belt on April 15, 2014.  A.A. was under 13 years of age.

¶ 5        In December 2014, the State filed a motion *in limine*, seeking to introduce at trial A.A.'s out-of-court statements about what took place on April 15, 2014, under section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2014)).  Specifically, the State sought to introduce A.A.'s statements at school through the testimony of Deputies Javier Lofton-Knox and Randy Husemen, and during an interview at the Child Advocacy Center (Center) through Detective Doug McQuern and Sergeant Brad Waddill.  The State also sought to present the recorded interview of A.A.  After a January 7, 2015, hearing, the trial court granted the State's motion.

¶ 6        In January 2015, defendant filed a motion *in limine* asking the trial court to "enter an order excluding any and all testimony, reference to testimony or argument that the bruising depicted on [A.A.] was caused by the belt in evidence or any other belt, and for such other and further relief as this Court deems fair and just."  The motion noted the State listed no expert witnesses to provide testimony A.A.'s injuries "were made by the belt in the custody of the State or any belt."  At the February 4, 2015, hearing on the motion *in limine*, defense counsel stated the issue might be moot and noted he did not believe the State was going to call any expert witnesses to testify as to the origin of A.A.'s injuries based on his conversations with the State.  Further, defense counsel noted the State had not disclosed any expert witnesses.  However, defendant did not withdraw his motion *in limine*.  The trial court declined to hear the motion *in limine* that day and told defense counsel the motion could be heard at the final pretrial hearing or right before the trial started.  Defense counsel did not raise the motion *in limine* regarding testimony related to the belt at the final pretrial hearing.

¶ 7        The trial court commenced defendant's trial on February 15, 2015.  The evidence

relevant to the issues on appeal is set forth below.

¶ 8        Brent Zanger testified he was A.A.'s third-grade teacher on April 16, 2014. At the start of that school day, A.A. approached Zanger and told him defendant had hit him with a belt. AA. showed Zanger bruises on his legs and back. Zanger immediately took A.A. to the school principal's office and had A.A. tell Theresa Fessler, the school principal, what he told Zanger. Zanger returned to his classroom, and A.A. returned 15 to 20 minutes later. Towards the end of the school day, A.A. left the classroom to speak with someone from the Department of Children and Family Services (DCFS). Zanger testified the photographs of A.A.'s lower back, upper thigh area on one of A.A.'s legs, and thigh area of the other leg were true and accurate representations of what Zanger observed on April 16, 2014.

¶ 9        Fessler testified A.A. showed her bruises on his legs, chest, and back, which included a three- or four-inch bruise on his left leg. The injuries on A.A.'s right leg were not as severe. Fessler testified this was the first time she had this issue with A.A. Fessler contacted DCFS, and a DCFS worker and three sheriff's deputies came to the school. They took photographs of A.A. and interviewed him for 30 to 45 minutes. Fessler was present for the interview. She testified A.A. told the officers the following:

> "[H]e had been in trouble at home because he had had his card flipped so there had been some discipline actions in the classroom and that his dad had the belt and was whipping him with the belt and that he tried to get away and he told us how he had to go out the door to try to escape and then when he came back in, he was whipped again."

Additionally, Fessler testified the photographs of A.A.'s chest, lower back, side, and upper thigh area of both of A.A.'s legs were true and accurate representations of what she observed on April

16, 2014.

¶ 10 A.A., who was nine years old at the time of trial, testified that, when he was in third grade, he lived with his grandmother; his father; his father's wife Patty; and his younger brother C.K.A., who was eight years old. His third-grade teacher was Mr. Zanger. A.A. testified he remembered talking to some police officers about whether his father "whopped" him. A.A. testified his father never "whopped" him. He said he told Mr. Zanger and the principal his father "whopped" him, but it was not true. A.A. testified he did not remember what he told the police officers either at the school or the next day at the Center. According to his testimony, his bruises resulted from his brother C.K.A. striking him with a toy snake. He did not mention the toy snake to the police because he thought he might get in trouble. A.A. said he told the police his father caused the bruises "to get payback on him" for paying attention to A.A.'s older brother. According to A.A., he lied to the people at school when he said his father hit him. A.A. testified he was telling the truth in court. He also stated he wanted his father to come home. A.A. further testified his father would not be able to live with him if he stated his father hit him.

¶ 11 On cross-examination, A.A. testified he and C.K.A. wrestle a lot and hit each other with a toy snake. A.A. identified a photograph of the toy snake. A.A. also testified the bruise on his leg was caused by him running into a table. A.A. stated the photographs of his side and chest showed poison ivy. He also explained the photograph of his left leg showed bruising from him hitting the table and the red area was also poison ivy. A.A. stated he was not afraid of anyone in his home. According to A.A., his grandmother, Lois Armour, hit him with rulers, belts, spoons, or whatever else she could grab. He explained Lois usually used a ruler and hit him in the legs.

¶ 12 On redirect examination, A.A. said he did not tell the police Lois was the one who

hit him because he was afraid of Lois. Regarding the toy snake, he said he would usually hit C.K.A. pretty hard with the snake but it did not leave marks. A.A. testified he was bigger than C.K.A. He also testified he would not have marks when C.K.A. hit him with the snake. Moreover, A.A. testified about a time Lois punched, hit, and kicked him and then told him not to tell his teacher. According to A.A., Lois told him to tell the people at school that his father hit him with the belt.

¶ 13        C.K.A. also testified. At the time of his testimony, he was eight years old and in second grade. C.K.A. testified he remembered talking to some police officers when he was in first grade but did not remember what they talked about. He did not remember A.A. getting hit with a belt. He also did not remember telling the police he saw his brother get hit with a belt or that his father hit A.A. with the belt. C.K.A. further stated he did not remember telling the police A.A. tried to run outside or that Patty told A.A. to come back inside. He did not remember telling the police A.A. had scratches on his chest. C.K.A. also did not remember when his father lived with him. C.K.A. testified he liked living with Lois and wanted to make Lois happy. He also testified he wanted his father to come home.

¶ 14        On cross-examination, C.K.A. testified Lois disciplined A.A. When A.A. got in trouble, A.A. would get his "butt whooped" by Lois. C.K.A. also testified he and A.A. would "whoop" each other with the toy snake. On redirect examination, C.K.A. stated both his father and Lois would punish him and A.A. According to C.K.A., Lois "whooped" them, but his father just put them in time-out when they were in trouble.

¶ 15        Mark Foley testified he worked for DCFS and investigated abuse and neglect claims. He went to A.A.'s school after the principal's call and met three sheriff's deputies. He spoke with A.A. in the principal's office. Fessler and the deputies were present for his interview.

According to Foley, A.A. indicated his father was upset because A.A. got in trouble at school. A.A. said his father hit him with a belt between 10 and 20 times across his body. At one point, A.A. went out the door and into the yard. His foot got caught in the door on his way out. His stepmother asked him to come back inside the house, which he did. When he was back inside, his father smacked him on the head with his hand. Foley also testified he observed A.A.'s injuries. A.A. had bruises on his legs, his foot, his arms, and his midsection. Over defendant's objection, Foley was allowed to testify A.A.'s injuries were consistent with a belt. On cross-examination, Foley testified A.A.'s bruising could potentially be consistent with a version of events where A.A. was hit with a toy snake. On redirect examination, he testified A.A. never mentioned getting hit with a plastic snake or being exposed to poison ivy. Additionally, Foley also testified he watched A.A.'s and C.K.A.'s respective interviews at the Center. Foley testified A.A. gave the same statement he made at school. Foley also testified Lois did take A.A. to the emergency room the evening of his report of the injuries to be examined. No additional injuries were found.

¶ 16 Deputy Dave Mason testified he also attended the interview at A.A.'s school. He testified A.A. stated he was disciplined by his father, who spanked him between 10 to 20 times with a belt. Deputy Mason also observed A.A.'s bruises. He stated A.A. had a total of eight bruises on his front and back that were red and purplish in color.

¶ 17 After Deputy Mason's testimony, defense counsel moved for a mistrial based on Foley's testimony regarding A.A.'s bruises being consistent with a belt. The trial court denied the motion.

¶ 18 Deputy Lofton-Knox testified he was also present at the interview of A.A. at his school. His testimony regarding A.A.'s statements was consistent with Fessler's, Foley's, and

Deputy Mason's. He also observed bruising on A.A. The day after the interview, Deputy Lofton-Knox went to defendant's home and collected three belts. Deputy Huseman was also present at the interview of A.A. at the school and gave essentially the same testimony about A.A.'s statements and injuries.

¶ 19 Sergeant Waddill testified he took photographs of A.A. during his interview at the Center. Sergeant Waddill identified the 11 photographs he took of A.A. and testified the photographs were a true and accurate representation of what he observed at the interview. Detective Doug McQuern testified he conducted the interview of A.A. at the Center. He testified regarding how he conducted the interview. The State also played for the jury Detective McQuern's interviews of A.A. and C.K.A. The trial court admitted A.A.'s interview under section 115-10 of the Code (725 ILCS 5/115-10 (West 2014)) and C.K.A.'s interview as a prior inconsistent statement pursuant to section 115-10.1 of the Code (725 ILCS 5/115-10.1 (West 2014)).

¶ 20 At the conclusion of the State's evidence, defense counsel renewed his motion for a mistrial and made a motion for a directed verdict. The trial court denied both motions.

¶ 21 Defendant presented the testimony of Danielle Fearn, who testified she, her son, and boyfriend had been staying with defendant and Patty for a couple of months on or about April 15, 2014. At that time, she was around A.A. and C.K.A. daily. Fearn testified the boys liked roughhousing with each other. Lois would try to discipline the boys. Fearn never saw defendant discipline the boys. According to Fearn, Lois would use a belt, ruler, coat hanger, or anything else she could grab to discipline the boys. Fearn thought the boys were scared of Lois. Fearn testified she woke up and saw Lois screaming and chasing A.A. on April 15, 2014. She did not see defendant discipline A.A. but did see Lois spank A.A. that day. Fearn did not

observe any bruises on A.A.

¶ 22 Eric Willemarck testified he was Fearn's boyfriend. He and Fearn were living with the Armours on April 15, 2014. He also testified A.A. and C.K.A. liked to wrestle and roughhouse, threw toys at each other, and chased each other with a rubber snake. The boys even hit him with the snake. On April 15, 2014, he did not see anything happen between A.A. and defendant or see A.A. running around the inside of the house yelling and screaming. Willemarck testified he had never seen defendant hit A.A. with a belt. Willemarck stated Lois was the one who usually disciplined the boys. She would first yell and scream at them, and if that did not work, she would swat them with her hand, belt, flyswatter, or ruler. Willemarck did not observe any bruises or marks on A.A. on April 15, 2014.

¶ 23 Patty testified Lois disciplined the boys when they got in trouble at school by yelling at them and hitting them with a belt or ruler. Patty testified she did not believe in using a belt on the boys. Patty disciplined the boys by putting them in time-out or taking toys away from them. According to Patty, A.A. was not a truthful young man. She also testified A.A. and C.K.A. liked to roughhouse with each other. Additionally, Patty testified she heard Lois tell the boys to say "you do not know" when asked questions by the police, a teacher, or DCFS. If the questions were about her, she instructed the boys to say their grandmother did not do it. If they did not do that, they would be in trouble when they got home. Patty stated the boys were scared of Lois.

¶ 24 As to April 15, 2014, Patty testified A.A. admitted he got in trouble at school and she disciplined him by taking away a toy. Later, A.A. came running into the kitchen, slid, and fell into the kitchen table. A.A. said he hurt a little and pointed to the top part of his right leg. Patty stated she never saw defendant use a belt on A.A. on April 15 or ever spank the children.

Defendant disciplined the boys by raising his voice and putting them in timeout. A.A. complained his leg hurt later in the evening, and she examined his right leg. Patty testified she observed a bruise on the upper part of his right leg. On the morning of April 16, 2014, A.A. was wrestling with defendant on the bed before school, fell off the bed, and hit his back against the dresser. However, Patty testified he did not hit the dresser very hard. She checked his back for marks and did not see any. Patty further testified the marks on A.A.'s feet were from the new riding boots he wore when using his dirt bike. Patty did observe more marks on A.A. on the night of April 16 than what she saw the night before. She did not know how A.A. got the new marks. Additionally, Patty testified A.A. had poison ivy at that time, which she was treating. Patty testified she did see Lois hit A.A. on the head on April 15, 2014, but did not see her strike him with a belt.

¶ 25　　　　Tracy Marlow testified she dated defendant for a "couple years," beginning in 2007. During their relationship, she lived with defendant, A.A., and C.K.A. She stated she still sees the boys as often as she can. Marlow described A.A. and C.K.A. as being typical boys— fighting, arguing, wrestling, kicking, and punching each other. She stated C.K.A. would get mad and throw toys at, slap, and hit A.A. According to Marlow, the boys would end up with marks and bruises. Lois did not live with them, but when she was around, Lois was stricter with the boys. Lois disciplined the boys by spanking them with her hand, but Marlow never saw her use a belt. She never saw defendant "raise a hand to those boys." According to Marlow, defendant never used a belt on the boys. Marlow never saw any marks on the boys that raised a concern.

¶ 26　　　　Dewane McMullen testified he had been friends with defendant since 2000 or 2001. He was often around defendant and the boys. He had never seen defendant physically discipline A.A. or C.K.A. According to McMullen, defendant was not very strict with the boys.

McMullen testified the boys would fight with each other like typical kids. McMullen testified the marks on A.A.'s feet were a result of A.A.'s motorcycle boots rubbing his feet raw.

¶ 27 At the conclusion of the trial, the jury found defendant guilty on both counts. On March 18, 2015, the trial court sentenced defendant to seven years in prison on the aggravated domestic battery conviction and vacated defendant's aggravated battery conviction based on the one-act, one-crime doctrine. Defendant filed a motion for a judgment notwithstanding the verdict or for a new trial and later filed a motion to reduce or modify his sentence. On April 16, 2015, the court denied both motions.

¶ 28 Defendant appealed and raised the following issues: (1) the trial court erred by allowing Foley to offer opinion testimony on the cause of A.A.'s injuries, (2) the court erred by admitting the videotaped interview of C.K.A. under section 115-10.1 of the Code, (3) the State's closing argument was improper, and (4) the State's evidence was insufficient to establish defendant's guilt beyond a reasonable doubt. This court affirmed the trial court's judgment. *People v. Armour*, 2016 IL App (4th) 150380-U.

¶ 29 In September 2018, defendant filed *pro se* a petition for relief under the Post-Conviction Hearing Act (Postconviction Act) (725 ILCS 5/122-1 *et seq.* (West 2018)), raising numerous claims of ineffective assistance of trial and appellate counsel. On December 4, 2018, the circuit court filed a written order, dismissing defendant's petition at the first stage of the postconviction proceedings.

¶ 30 On December 21, 2018, defendant filed a timely notice of appeal in sufficient compliance with Illinois Supreme Court Rule 606(c) (eff. July 1, 2017). See Ill. S. Ct. R. 651(d) (eff. July 1, 2017) (providing the supreme court rules governing criminal appeals apply to appeals in postconviction proceedings). Accordingly, this court has jurisdiction under Illinois

Supreme Court Rule 651(a) (eff. July 1, 2017).

¶ 31                                      II. ANALYSIS

¶ 32            The Postconviction Act "provides a mechanism for criminal defendants to

challenge their convictions or sentences based on a substantial violation of their rights under the

federal or state constitutions." *People v. Morris*, 236 Ill. 2d 345, 354, 925 N.E.2d 1069, 1074-75

(2010). A proceeding under the Postconviction Act is a collateral proceeding and not an appeal

from the defendant's conviction and sentence. *People v. English*, 2013 IL 112890, ¶ 21, 987

N.E.2d 371. The defendant must show he suffered a substantial deprivation of his federal or

state constitutional rights. *People v. Caballero*, 228 Ill. 2d 79, 83, 885 N.E.2d 1044, 1046

(2008).

¶ 33            The Postconviction Act establishes a three-stage process for adjudicating a

postconviction petition. *English*, 2013 IL 112890, ¶ 23. Here, defendant's petition was

dismissed at the first stage. At the first stage, the circuit court must review the postconviction

petition and determine whether "the petition is frivolous or is patently without merit." 725 ILCS

5/122-2.1(a)(2) (West 2018). To survive dismissal at this initial stage, the postconviction

petition "need only present the gist of a constitutional claim," which is "a low threshold" that

requires the petition to contain only "a limited amount of detail." *People v. Gaultney*, 174 Ill. 2d

410, 418, 675 N.E.2d 102, 106 (1996). Our supreme court has held "a *pro se* petition seeking

postconviction relief under the [Postconviction] Act for a denial of constitutional rights may be

summarily dismissed as frivolous or patently without merit only if the petition has no arguable

basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 11-12, 912 N.E.2d 1204, 1209

(2009). A petition lacks an arguable legal basis when it is based on an indisputably meritless

legal theory, such as one that is completely contradicted by the record. *Hodges*, 234 Ill. 2d at 16,

912 N.E.2d at 1212. A petition lacks an arguable factual basis when it is based on a fanciful factual allegation, such as one that is clearly baseless, fantastic, or delusional. *Hodges*, 234 Ill. 2d at 16-17, 912 N.E.2d at 1212. "In considering a petition pursuant to [section 122-2.1 of the Postconviction Act], the court may examine the court file of the proceeding in which the petitioner was convicted, any action taken by an appellate court in such proceeding and any transcripts of such proceeding." 725 ILCS 5/122-2.1(c) (West 2018); see also *People v. Brown*, 236 Ill. 2d 175, 184, 923 N.E.2d 748, 754 (2010).

¶ 34    Our review of the first-stage dismissal of a postconviction petition is *de novo*. *People v. Dunlap*, 2011 IL App (4th) 100595, ¶ 20, 963 N.E.2d 394. With the *de novo* standard, the reviewing court affords no deference to the circuit court's judgment or reasoning. *People v. Walker*, 2018 IL App (1st) 160509, ¶ 22, 128 N.E.3d 978. Essentially, the reviewing court performs the same analysis the circuit court would have performed. *Walker*, 2018 IL App (1st) 160509, ¶ 22. Additionally, the reviewing court may affirm the circuit court's judgment on any basis found in the record. *Walker*, 2018 IL App (1st) 160509, ¶ 23.

¶ 35    On appeal, defendant contends he received ineffective assistance of trial counsel because counsel failed to (1) introduce two reports showing A.A.'s injuries were caused by something other than a belt and (2) offer expert testimony showing A.A's injuries were caused by something other than a belt. He also asserts he was denied effective assistance by appellate counsel because of appellate counsel's failure to assert trial counsel was ineffective for not objecting to Zanger's hearsay testimony. This court analyzes ineffective assistance of counsel claims under the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Evans*, 186 Ill. 2d 83, 93, 708 N.E.2d 1158, 1163 (1999). To obtain reversal under *Strickland*, a defendant must prove (1) his counsel's performance failed to meet an objective standard of

competence and (2) counsel's deficient performance resulted in prejudice to the defendant. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163. To satisfy the deficiency prong of *Strickland*, the defendant must demonstrate counsel made errors so serious and counsel's performance was so deficient that counsel was not functioning as "counsel" guaranteed by the sixth amendment (U.S. Const., amend. VI). *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163. Further, the defendant must overcome the strong presumption the challenged action or inaction could have been the product of sound trial strategy. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163. To satisfy the prejudice prong, the defendant must prove a reasonable probability exists that, but for counsel's unprofessional errors, the proceeding's result would have been different. *Evans*, 186 Ill. 2d at 93, 708 N.E.2d at 1163-64. The *Strickland* Court noted a case should be decided on the ground of lack of sufficient prejudice rather than counsel's constitutionally deficient representation if it is easier to do so. *Strickland*, 466 U.S. at 697.

¶ 36                                    A. Reports

¶ 37        Defendant contends he stated the gist of a constitutional claim his trial counsel was ineffective for failing to introduce two reports that showed A.A.'s injuries were caused by something other than a belt. The State disagrees, asserting defendant was not arguably prejudiced.

¶ 38        In his postconviction petition, defendant alleged both DCFS's and the Center's report showed there were other causes for the marks on A.A. Even accepting the allegation as true, the allegation is too vague to show defendant was arguably prejudiced by counsel's actions where defense counsel presented evidence at trial showing the marks on A.A. were caused by things other than a belt. A defendant cannot make out a claim of ineffective assistance of counsel where the evidence he claims should have been offered by counsel was cumulative to

- 13 -

evidence already in the record. *People v. Phyfiher*, 361 Ill. App. 3d 881, 886, 838 N.E.2d 181, 186 (2005). Defendant's postconviction petition further stated the DCFS report showed Foley went to the boys' doctor and learned both boys had poison ivy. The petition also alleged the report stated a doctor noted the marks on A.A.'s feet were due to A.A. breaking in a pair of motorcycle boots. At defendant's trial, both A.A. and Patty testified about A.A. having poison ivy around April 15, 2014. Moreover, Patty and McMullen both testified about the marks on defendant's feet being caused by new boots. Thus, defendant's allegations related to the DCFS report present only evidence that is cumulative to evidence already presented at defendant's trial. As to the Center's report, defendant's petition is not clear whether he was referring to the recording of the interview or a report on the interview when he alleged "it" showed C.K.A. was coerced on what to say. Even if defendant was referring to the Center's report, the allegation of coercion does not show another cause for the marks on A.A. Accordingly, we find defendant's postconviction petition did not state the gist of a constitutional claim his counsel was ineffective for failing to present the reports of DCFS and the Center.

¶ 39                                       B. Hearsay Testimony

¶ 40         Defendant next asserts he stated the gist of a constitutional claim his appellate counsel was ineffective for not arguing on direct appeal trial counsel was ineffective for not objecting to Zanger's testimony about A.A.'s statements made at school. The State asserts defendant has forfeited this issue by failing to raise it in his postconviction petition. See *People v. Jones*, 213 Ill. 2d 498, 505, 821 N.E.2d 1093, 1097 (2004) (noting our supreme court has generally held a claim not raised in a postconviction petition cannot be argued for the first time on appeal). In reply, defendant contends he alleged in his postconviction petition A.A.'s and C.K.A.'s statements and other State's evidence were not verified. He claims that, construing his

allegations liberally, he was challenging the veracity of A.A.'s statements, which included those made to Zanger. The claim in the defendant's petition "must bear some relationship to the issue raised on appeal" for "[l]iberal construction does not mean that we distort reality." *People v. Mars*, 2012 IL App (2d) 110695, ¶ 32, 985 N.E.2d 570. Even with a liberal construction of defendant's postconviction petition, defendant never alleged his trial counsel should have raised a hearsay objection to Zanger's testimony regarding A.A.'s statements. Thus, we agree with the State defendant has forfeited this issue.

¶ 41                                    C. Expert Testimony

¶ 42          Last, defendant argues he stated a gist of a constitutional claim his trial counsel was ineffective for failing to present testimony from an expert witness A.A.'s injuries were caused by something other than a belt. The State asserts defendant's claim was not properly supported. We agree with the State.

¶ 43          Section 122-2 of the Postconviction Act (725 ILCS 5/122-2 (West 2018)) requires a postconviction petition to "have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." The purpose of that requirement is to show the allegations in the postconviction petition are "capable of 'objective or independent corroboration.' " *People v. Delton*, 227 Ill. 2d 247, 254, 882 N.E.2d 516, 520 (2008) (quoting *People v. Hall*, 217 Ill. 2d 324, 333, 841 N.E.2d 913, 919 (2005)). A defendant's failure to attach the documentation required by section 122-2 or explain its absence alone justifies summary dismissal of the postconviction petition. *Delton*, 227 Ill. 2d at 255, 882 N.E.2d at 520.

¶ 44          Here, defendant alleges in his postconviction petition trial counsel failed to offer expert testimony showing A.A.'s injuries were caused by something other than a belt. Defendant

failed to provide any documentation supporting his claim or provide a reason for the lack of the documentation. "When a defendant attacks competency of counsel for failing to call or contact certain witnesses, he must attach affidavits of these witnesses to his post-conviction petition and explain the significance of their testimony." *People v. Carmickle*, 97 Ill. App. 3d 917, 920, 424 N.E.2d 78, 80 (1981). Given defendant's lack of documentation supporting this claim, he failed to comply with section 122-2 of the Postconviction Act (725 ILCS 5/122-2 (West 2018)). Thus, we find the circuit court properly found this claim was frivolous and without merit.

¶ 45                               III. CONCLUSION

¶ 46            For the reasons stated, we affirm the Adams County circuit court's judgment.

¶ 47            Affirmed.